No. 57,843

BOARD OF EDUCATION UNIFIED SCHOOL DISTRICT No. 259 SEDGWICK COUNTY, KANSAS, *Appellee*, v. KANSAS-NATIONAL EDUCATION ASSOCIATION and NATIONAL EDUCATION ASSOCIATION-WICHITA, *Appellants*.

(716 P.2d 571)

Opinion filed March 28, 1986.

*David M. Schauner*, of Topeka, argued the cause and was on the brief for appellants.

*William H. Dye*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Wyatt M. Wright*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is a declaratory judgment action brought by the Board of Education of Unified School District No. 259 (USD 259 or Board) against Kansas-National Education Association (K-NEA) and National Education Association-Wichita (NEA-W). K-NEA and NEA-W appeal from a judgment in favor of USD 259.

This dispute arose as a result of a $354,839.83 divisible surplus (refund) paid by Blue Cross and Blue Shield of Kansas, Inc., (BC-BS) to the school district as trustee. BC-BS was an indispensable party before the district court because it was obligated by contract to account and determine the reserves which resulted in the divisible surplus. The surplus was in BC-BS possession when this suit was filed. Since that time, however, the surplus has been refunded to USD 259 and held in trust under supervision of the district court. BC-BS is no longer a party to this action pursuant to the "Stipulation for Voluntary Dismissal" filed with this court.

NEA-W is the exclusive bargaining agent for the teachers employed by USD 259. NEA-W negotiated a contract with USD 259 in 1981, which was ratified by a majority of the USD 259 teachers and signed by the Board. The contract ran from August 1, 1981, to July 31, 1983. Teachers' health insurance was negotiated and became a part of that contract. As a result of this negotiation, the Board entered into a group health insurance contract with BC-BS. That negotiated contract contained a divisible surplus rider, the provisions of which are set forth later in this opinion.

On February 1, 1982, the contract between the teachers and USD 259 was amended by mutual consent.

Article Nine (IX), Section F, paragraphs 1 through 3 of the amended contract relate to health insurance benefits:

"Paragraph 1: Through January 31, 1982, the Board shall contribute $60 per month for each teacher employed full time toward the payment of premiums in the Board provided group health insurance plan. Effective February 1, 1982, and for the remainder of the term of this agreement, the Board shall contribute $65 per month for each teacher employed full time who enrolls in the Board provided health insurance plan toward payment of premiums for the plan selected.

"Paragraph 2: If a teacher enrolls in the Board provided group health insurance plan and the Board contribution exceeds the amount of the health insurance premium in the plan selected, then such excess shall be paid to that teacher as extra earnings in regular payroll checks and shall be subject to all applicable deductions.

"Paragraph 3: If a teacher does not enroll in the Board provided group health insurance plan, the Board shall contribute $60 per month for each teacher employed full time. Such contribution shall be paid to that teacher as extra earnings in regular payroll checks and shall be subject to all applicable deductions."

Thus, as we can see under the negotiated contract, the Board agreed to pay $60 per month per teacher ($65 per month after February 1, 1982) toward the cost of the group health insurance plan. Participating teachers paid any amount over and above the amount paid by the Board. Those teachers who chose not to enroll in the BC-BS plan received $60 per month in additional salary.

The "plan year" for BC-BS begins on November 1 each year and ends on October 31 of the following year. Thus, the 1980-81 "plan year" commenced on November 1, 1980, and ended on October 31, 1981. Similarly, the 1981-82 "plan year" commenced on November 1, 1981 and ended October 31, 1982.

During the first plan year of the teachers' contract, five USD 259 employee groups participated in the BC-BS plan, one group of which was the certified employees (teachers) represented by NEA-W. All of the uncertified employees voluntarily withdrew from the BC-BS plan as of September 31, 1981. They were not parties to the teachers' contract and elected health insurance coverage under a board of education self-insurance plan. Therefore, from October 1, 1981, through October 31, 1982, the certified employees were the sole participants in the BC-BS health insurance plan made available by the Board.

The premiums collected by BC-BS for the plan year November 1, 1981, to October 31, 1982, exceeded total claims, expenses and reserves by the amount of $354,839.83. This amount is referred to as "divisible surplus." BC-BS refunded the surplus to the Board, as trustee under court supervision. The distribution of the divisible surplus accumulated under the health insurance policy is the subject of the present controversy.

The group contract between the Board and BC-BS contained a "Divisible Surplus Rider," which provided for the distribution of divisible surplus as follows:

"C.1 Divisible Surplus is distributed in this manner:
　　"a. To meet the Contract Holder's minimum group reserve needs (if any) for the Blue Cross of Kansas portions of the Group Contract(s).
　　"b. The remainder, if any, is paid in cash to the Contract Holder or upon written request applied as an adjustment of future dues.
"C.2 Any part of the Divisible Surplus that is paid in cash and is in excess of the Contract Holder's share of the dues shall be applied for the sole benefit of the Subscribers.
"C.3 Distribution of any Divisible Surplus in accordance with this Rider shall completely discharge Blue Shield of Kansas from liability with respect to the adjustment of dues so distributed."

The Board filed the present action on January 11, 1983, seeking a declaratory judgment that the surplus be determined to be a mandatorily negotiable item under K.S.A. 72-5413(l) in the next contract negotiated between the Board and teachers.

The district court found for the Board and held that the premium refund is a mandatorily negotiable item pursuant to K.S.A. 72-5413(l) and the teachers currently employed by USD 259 are entitled to share in the benefit of the divisible surplus in the amount of $268,542.55 plus seventy-five percent (75%) of the interest earned to date. The court further determined that the

Board is the contract holder and, as such, is entitled to negotiate how the surplus will be applied for the benefit of the group.

The first issue on appeal is whether the trial court erred in finding that the manner of distribution of surplus health insurance premiums is mandatorily negotiable pursuant to K.S.A. 72-5413(1).

There is no question the health insurance benefits provided under the 1981-83 contract between the teachers and the Board were mandatorily negotiable (K.S.A. 72-5413) and accordingly, were negotiated by the parties. That is not the issue here. The issue here is whether a divisible surplus accumulated under the health insurance policy purchased by the Board pursuant to the negotiated agreement is outside the terms of the negotiated contract and subject to additional negotiation. We think not. The surplus is a product or result of the contract previously negotiated. The insurance policy anticipated such a surplus by including a Divisible Surplus Rider. The insurance benefits under which the divisible surplus was accumulated were negotiated and they are therefore not subject to renegotiation.

The next issue is who is entitled to receive the refund of the divisible surplus under the BC-BS policy.

Appellants argue that only those individuals enrolled in the BC-BS plan on October 31, 1982, are entitled to share in a prorated distribution of the divisible surplus. The Board, however, contends the surplus is a "plan asset" available for the benefit of the group which is currently the subscriber to the health insurance plan. The Board reasons that the essence of group insurance coverage is the pooling of risk and benefits as a group.

The trial court granted judgment in favor of the Board, holding that those teachers still in the employ of USD 259 and eligible for the surplus in issue constitute a voluntary association entitled to share as a group in the benefit of the divisible surplus.

Appellants rely upon Attorney General Opinion No. 81-97, dated April 21, 1981, for the proposition that the individual teachers participating in the health insurance plan on October 31, 1982, are entitled to the refund.

The Attorney General opinion is predicated upon a fact situation where there was no divisible surplus rider in the health insurance contract such as exists in this case. Thus, it is distinguishable from the present controversy. However, the Attorney

General opinion states that had the health insurance policy in question contained such a rider, the language of the rider would control the disposition of the refund. We agree with that statement and hold that where a contractual provision in a group health insurance plan specifies the method of distribution of a divisible surplus, that provision controls.

Under the provisions of the Divisible Surplus Rider of the BC-BS policy, any surplus is to be "paid in cash to the Contract Holder or upon written request applied as an adjustment of future dues." The Board, as "Contract Holder," makes no claim to the refund and the teachers have declined to have the surplus applied as an adjustment of future dues. Accordingly, we are concerned with the section of the rider which provides that any excess refund "shall be applied for the sole benefit of the Subscribers."

The parties disagree as to who are the "subscribers" referred to in the policy. The policy defines subscriber as "the person named on the Identification Card." It also says,

"X.1 Subscriber also means the following persons under a Family Membership:
 a. The husband or wife of the person named on the Identification Card; and
 b. Each unmarried dependent child by birth or adoption who is:
 (1) under age 21; or
 (2) Over age 21 but is not capable of self-support . . . ."

The policy makes no provision for the teachers as a group to be subscribers. The group is not issued an identification card. The policy recognizes only single members and family members as subscribers. We hold the BC-BS contract defines subscribers as the individuals who are covered by the health insurance.

Let us now turn to the question of which individuals were covered by the insurance and are thus entitled to the refund. As previously noted, the surplus occurred as the result of lower use of insurance benefits by the subscribers than was anticipated when the premiums were determined. The subscribers overpaid their premiums. Hence, those who overpaid their insurance premiums created the surplus and should receive the refund.

Appellants argue that the subscribers on the last day of the BC-BS contract year, October 31, 1982, are entitled to the entire surplus. Appellants and appellee both present an alternate plan which is quite similar. It provides that the divisible surplus be divided among all the subscribers during the two-year term of

the teachers' contract. The trial court adopted a version of the alternate proposals.

The "Divisible Surplus Rider" of the policy was made a part of the policy to resolve this problem, and the "Retrospective Worksheets" of BC-BS show how BC-BS calculated the surplus. Let us examine each of these items.

The "Divisible Surplus Rider" provides:

"B. **Determination of Divisible Surplus.** Divisible Surplus accrued, if any, will be determined *as of each anniversary of the Contract Date* by Blue Shield of Kansas." (Emphasis added.)

The rider shows that pursuant to the contract it is BC-BS's obligation to determine the divisible surplus at the end of each contract year. It logically follows that the determination is calculated from the actuarial experience of the subscribers during the preceding year.

The BC-BS "Merit Rated-Retrospective Worksheets," included in the record on appeal, indicate the manner in which BC-BS calculated any refund to be made at the end of the plan year. A divisible surplus results where premiums collected for a plan year exceed total claims, expenses and reserves for that year. The worksheet for plan year November 1, 1980 through October 31, 1981, confirms that no divisible surplus resulted that year. However, the worksheet for plan year November 1, 1981, through October 31, 1982, shows a divisible surplus of $354,839.83. The contract placed the burden upon BC-BS to determine the amount of refund, if any, and the parties are bound by that determination.

Therefore, we have no hesitation in concluding that the subscribers for the period from November 1, 1981, through October 31, 1982, are entitled to a refund of the premium overpayment, the divisible surplus. Even though the amount was not determined until the end of the year, we are persuaded all of those whose contributions resulted in the overpayment should share in the refund. We hold the divisible surplus of $354,839.83 plus accrued interest be refunded to the 1981-82 subscribers proportionate to the premium paid by each for that contract year.

The judgment of the trial court is reversed and this case remanded for further proceedings to determine the names of the individual subscribers to the BC-BS health insurance policy for the period November 1, 1981, to October 31, 1982, and the

premium paid by each, with the refund of the divisible surplus apportioned accordingly.