No. 81,992

NEA-COFFEYVILLE, *Appellee,* and ROY GAGE, DARREL HARBAUGH, VELMA MCKINNEY, TED CREED, GLORIA GRIGSBY, AND DELPHINE JACKSON, *Intervenors/Appellees,* v. UNIFIED SCHOOL DISTRICT NO. 445, COFFEYVILLE, MONTGOMERY COUNTY, KANSAS, *Appellant.*

(996 P.2d 821)

Opinion filed January 28, 2000.

*Fred W. Rausch, Jr.*, of Topeka, argued the cause and was on the briefs for appellant.

*C.A. Menghini*, of Menghini & Menghini, L.L.C. of Pittsburg, argued the cause, and was on the brief for appellee NEA-Coffeyville.

*David M. Schauner* and *Gregory C. Brownfield*, of Topeka, argued the cause and were on the brief for intervenor appellees.

The opinion of the court was delivered by

DAVIS, J.: This case involves a dispute between public school teachers represented by the National Education Association-Coffeyville (NEA-C) and Unified School District No. 445 (the District) over a refund on group health insurance policies for the benefit of teachers. Blue Cross and Blue Shield of Kansas, Inc., (BCBS) paid the refund to the District in accordance with the terms of its contract with the District. The trial court determined that the refund belonged to the teachers. The District appeals. Our jurisdiction is under K.S.A. 20-3018(c).

The amount in controversy is $138,775.52, identified in the group health policies between the District and BCBS as a "divisible surplus." According to the contract between BCBS and the District, a divisible surplus occurs as a result of lower use of insurance benefits by subscribers than was anticipated when the premiums were determined. The period of time over which the divisible surplus accumulated spans the years 1991-1992, 1992-1993, and 1993-1994. The health insurance giving rise to the divisible surplus was part of the teachers' fringe benefit package.

The record below is extensive. Five separate contracts are involved. Two contracts are between the District and BCBS providing group health insurance coverage as a part of the fringe benefit package for individual teachers who elected coverage and were employed during the specified times at the District. Three contracts involved negotiated agreements between the District and the

exclusive bargaining representative for the teachers of the district, NEA-C. Before examining these contracts, the following procedural and jurisdictional questions raised by the parties must be resolved: (1) Is NEA-C a proper party; and (2) did the district court have jurisdiction over the subject matter, thus conferring jurisdiction upon this court?

(1) *Is NEA-C a proper party?*

The District argues that NEA-C should be dismissed as a plaintiff because it is without capacity to maintain an action against the District. The District argues that NEA-C, as an unincorporated association, may only sue a school district under certain situations set forth in *Seaman Dist. Teachers' Ass'n v. Board of Education,* 217 Kan. 233, 535 P.2d 889 (1997).

This question involves a proper interpretation of our decision in *Seaman.* Thus, the question presented is one of law, and this court's review is unlimited. *In re Estate of Winslow,* 23 Kan. App. 2d 670, 677, 934 P.2d 1001 (1997) (a de novo standard of review applies to the interpretation of case law).

In *Seaman,* this court held:

"A primary purpose of the collective negotiations statute was to provide a spokesman and representative for the individual professional employees for the protection and the improvement of their rights. We think the act itself in enabling a professional employees' organization . . . to perform its statutory duties . . . permits the professional employees' organization to sue or be sued in the association's name." 217 Kan. at 244.

The District argues that *Seaman* limits NEA-C's ability to sue to those situations involving a dispute arising out of the negotiation process. According to the District, claims must have a "negotiations nexus" before a teachers' association may file suit in district court. Because the negotiated agreements do not refer to the divisible surplus, a point which will be discussed more fully below, the District contends the dispute over the surplus is not within the rule of *Seaman.*

Contrary to the District's position, our holding in *Seaman* was not so limited. In *Seaman,* we recognized that a professional employees' association is charged by statute with a task of improving

the employees' rights. The act authorizing collective negotiations, enabling a professional employees' organization organized pursuant to statute to perform its statutory duties, responsibilities, and functions, permits the professional employees' organization to sue or be sued in the association's name. 217 Kan. at 244. NEA-C, as the exclusive bargaining agent for the District's teachers, has standing to sue where the protection of teachers' rights is at issue. See K.S.A. 72-5414.

The United States Supreme Court has held that an association has standing to sue on behalf of its members when: (1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested require participation of individual members. *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977).

NEA-C satisfies the requirements of the above test. Its members are identified as beneficiaries of the District's BCBS contract. As such, the members have standing to sue individually under a third-party beneficiary theory. See *Fasse v. Lower Heating & Air Conditioning, Inc.*, 241 Kan. 387, Syl. ¶ 1, 736 P.2d 930 (1987). Moreover, the interest NEA-C seeks to protect is the monetary refund from insurance contracts made for the members' benefit and generated by their conduct. Finally, none of the individual member's participation is necessary. We conclude that NEA-C is a proper party plaintiff.

(2) *Did the district court have jurisdiction to consider plaintiffs' claim or more specifically, did NEA-C fail to exhaust its administrative remedies?*

An allegation that a party is required to or has failed to exhaust its administrative remedies presents a question of law. This court's review is unlimited. *Nora H. Ringler Revocable Family Trust v. Meyer Land and Cattle Co.*, 25 Kan. App. 2d 122, 132, 958 P.2d 1162, *rev. denied* 265 Kan. 886 (1998).

The resolution of this question depends upon the provisions of the negotiated agreements between the members of NEA-C and

the District with reference to grievance procedures. The agreements do provide for a procedure and define grievance as "any alleged violation of this negotiated agreement." The agreements provide for four levels of grievance procedure. An appeal may be taken from one level to the next until resolution of the grievance is obtained. The negotiated agreements do not "include in such agreement procedures for final and binding arbitration of such disputes as may arise involving the interpretation, application or violation of such agreement" provided for in K.S.A. 72-5424. Instead, the general rules in the negotiated agreements provide: "Nothing contained in this grievance procedure shall deprive teachers or the Board of Education or its representatives of any legal rights otherwise established by Kansas Law."

When the District received a refund, it did not notify the Board or the individual members insured under their contract with BCBS. Of the $138,775.52 refund, the District deposited $60,000 of the surplus into a special education fund. The remaining $78,775.52 was deposited into a health insurance reserve account.

During contract negotiations in July 1996, NEA-C negotiator Darrel Harbaugh discovered that BCBS had refunded the $138,775.52 to the District the year before. Harbaugh discovered this through information given to him by a representative of BCBS. In August 1996, Harbaugh requested a copy of the previous year's BCBS policy, but the District was unable to locate a copy of the policy. Harbaugh spent the next 6 months writing letters and making telephone calls attempting to gather information about the refund. Harbaugh corresponded directly with District Superintendent Larry Thomas and the business manager for the District, Richard Hendrix. Finally, Harbaugh made a written request to all members of the Coffeyville School Board (Board) that he be put on the agenda during the next regularly scheduled meeting to ask for a return of the surplus to the subscribers. Superintendent Thomas informed Harbaugh that he would be permitted to make the formal request.

On March 10, 1997, Harbaugh appeared before the Board during its regularly scheduled meeting to ask for a return of the refund to the subscribers. The Board heard Harbaugh's request, made no

decision, and tabled the matter until its next meeting on April 14, 1997. At the April meeting, the Board had an executive session to discuss the refund. The Board then stated it would delay its action until July when the newly elected members of the Board were in place. NEA-C filed this action May 15, 1997, before the scheduled July meeting.

In response to the District's argument that NEA-C failed to exhaust available administrative remedies, the district court held: (1) The grievance procedure in the negotiated agreements was neither available nor adequate; (2) if plaintiffs were required to exhaust their administrative remedies, they did so under the facts here; and (3) the District waived any right it had to this jurisdictional claim.

### Failure to Use an Adequate and Available Administrative Remedy

This court has consistently held that where an administrative remedy is provided by statute, such remedy ordinarily must be exhausted before a litigant may resort to the courts. *Pecenka v. Alquest*, 232 Kan. 97, Syl. ¶ 3, 652 P.2d 679 (1982). The District maintains that the grievance procedure in the negotiated agreements was both available and adequate because the Board possessed the authority to return the surplus. The district court concluded that the grievance procedure in the negotiated agreements was either inadequate or, if not, the teachers exhausted that remedy before filing suit.

The primary purpose of the doctrine of exhaustion of administration remedies is the avoidance of premature interruption of the administrative process. *Junction City Education Ass'n v. U.S.D. No. 475*, 264 Kan. 212, Syl. ¶ 3, 955 P.2d 1266 (1998). Because agency decisions are frequently of a discretionary nature or frequently require specific expertise, the agency should be given the first chance to exercise that discretion or to apply that specific expertise. 264 Kan. 212, Syl. ¶ 3. However, if no administrative remedy is available or if it is inadequate to address the problem at issue, exhaustion is not required. *Vann v. Employment Security Bd. of Review*, 12 Kan. App. 2d 778, Syl. ¶ 1, 756 P.2d 1107 (1988).

It is important to note in this case that the grievance procedure provided for in the negotiated agreements is not a statutory remedy. We are not dealing with a tax appeal. See, *e.g., State ex rel Smith v. Miller*, 239 Kan. 187, Syl. ¶ 1, 718 P.2d 1298 (1986). In *Smith*, a full and adequate administrative remedy was provided for by statute, and this court held that such remedy must be exhausted before resorting to the courts. Although the legislature directed under K.S.A. 72-5426 that the Secretary of the Department of Human Resources resolve certain negotiation disputes between teachers' associations and school boards, that statutory procedure applies in limited circumstances not involved in this case. There is no legislatively identified body to hear NEA-C's claim in this case. Thus, the cases cited by the District involving statutory administrative remedies do not address the question whether the grievance procedure provided for in negotiated agreements is an adequate administrative remedy.

The District argues that the grievance procedure, at least at the level claims are presented to the Board, is an adequate administrative remedy because the Board has the discretion to grant the relief requested. While this may be true, the strength of this argument is questionable under the facts of this case. *Schmidt v. U.S.D. No. 322*, 24 Kan. App. 2d 643, 647, 951 P.2d 960 (1997), and *Speece v. U.S.D. No. 420*, 6 Kan. App. 2d 71, 76, 626 P.2d 1202, *rev. denied* 229 Kan. 671 (1986), suggest that the grievance procedure available to NEA-C may not have been an adequate administrative remedy.

In *Schmidt*, a teacher brought suit in district court seeking compensation under a clause of his employment contract with the school district. Schmidt followed the grievance procedure until the Board rejected his claim. He then filed suit. The Board argued it was acting in a quasi-judicial manner when it rejected Schmidt's claim. If the Board was acting in such a manner, Schmidt's failure to comply with K.S.A. 60-2101(d) would have deprived the appellate court of jurisdiction. K.S.A. 60-2101 requires a plaintiff to file an appeal with the administrative agency within 30 days of its final decision.

The Court of Appeals held that Schmidt was not required to file the K.S.A. 60-2101(d) notice of appeal because the Board did not act in a quasi-judicial manner when it rendered its decision on his claim. The court stated:

"In rejecting Schmidt's claim for additional compensation, the Board was not acting as an impartial body rendering a quasi-judicial decision between contending parties. Instead, the Board was simply acting as an agent on behalf of its principal, the school district, in disallowing the claim." 24 Kan. App. 2d at 647.

In arriving at its decision, the Court of Appeals relied on the earlier case of *Speece.* In *Speece,* an untenured teacher appeared before the school board with his attorney asking for additional compensation and reinstatement of this contract. The Board eventually denied his requests. Speece then filed suit in the district court. The court dismissed Speece's petition for lack of jurisdiction under K.S.A. 60-2101(d). The Court of Appeals reversed, holding the Board had not acted in a quasi-judicial manner when rendering its decision. *Speece,* 6 Kan. App. 2d at 75-76. The court reasoned that the Board's refusal to pay Speece's claim for extra compensation was similar to any public body's denial of a contract claim.

" 'A claim presented to the county commissioners is simply a claim presented to the county, and a refusal by them to pay it is simply a refusal of the county to pay it. And where a county refuses to pay a claim against it there seems to be no good reason why it may not be sued as well as any other corporation, or as any individual, under like circumstances.' " 6 Kan. App. 2d at 76 (quoting *Comm'rs of Leavenworth v. Brewer,* 9 Kan. 307, 319 (1872).

Both *Schmidt* and *Speece* suggest that where a board of education is not acting as an impartial arbitrator of a claim, its procedure is not administrative. Like the plaintiffs in *Schmidt* and *Speece,* NEA-C was presenting a claim for payment of the refund to the Board. Under these facts, the grievance procedure as set forth in the negotiated agreements is not administrative. NEA-C's failure to follow through with a final presentation to the Board did not, therefore, deprive the district court of its jurisdiction.

The district court was correct in its conclusion that the administrative procedure available to NEA-C was not an adequate one. We need not address the District's argument that NEA-C was required to comply with the provisions of K.S.A. 60-2101(d).

## Did the District Court Err in Holding that the
## Plaintiffs are Entitled to the Refund?

We now turn to the central issue of this case: To whom does the divisible surplus refund belong? The answer to this question requires an interpretation of written instruments. The interpretation of written instruments is a question of law over which this court has unlimited review. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998).

The District maintains it is entitled to the entire refund because it paid the premiums that created the refund. The District argues that the refund represents a refund of insurance premiums it paid under the contract with BCBS for the benefit of the teachers.

NEA-C contends the subscribers are entitled to the entire refund because they, not the District, paid the premiums that created the refund. According to NEA-C, it bargained for health and medical insurance in the negotiated agreements between its members and the district for the years 1991-1992, 1992-1993, and 1993-1994. The health and medical insurance were part of the teachers' fringe benefit package. In NEA-C's view, the insurance premiums paid to BCBS by the District were "part and parcel of each teacher's annual salary" and, thus, paid by the teachers and not the District.

The district court ruled in favor of NEA-C, citing equitable principles and this court's decision in *U.S.D. No. 259 v. Kansas-National Education Ass'n*, 239 Kan. 76, 716 P.2d 571 (1986). *U.S.D. No. 259* is the only published case in Kansas dealing with a "divisible surplus."

### A. BCBS Contracts

The only contracts to mention the refund are the contracts between the District and BCBS. The key provision in the agreements is the following rider provision requiring that under circumstances specified, the "divisible surplus" be distributed to the contract holder, the District:

"A. **Divisible Surplus Defined.** Divisible Surplus means the income derived from dues for the benefits of this Group Contract and which is available for a retroactive adjustment of dues.

. . . .

"B. **Determination of Divisible Surplus**. Divisible Surplus accrued, if any, will be determined as of each anniversary of the Contract Date by the Plan. If this Contract is canceled prior to an anniversary date, Divisible Surplus accrued, if any, will be determined as of the cancellation date; however, actual final settlement requires approximately 18 months after the cancellation date.

"C. **Distribution of Divisible Surplus**.

Divisible Surplus distributed in this manner:

"1. To meet the Contract Holder's minimum group reserve needs (if any) for the benefits of the Group Contract.

"2. The remainder, if any, is paid in cash to the Contract Holder or upon written request applied as an adjustment of future dues.

"Any part of the Divisible Surplus that is paid in cash and is in excess of the Contract Holder's share of the dues shall be applied for the sole benefit of the Subscribers.

*"Distribution of any Divisible Surplus in accordance with this provision shall completely discharge the Plan from liability with respect to the adjustment of dues so distributed."* (Emphasis added.)

The "divisible surplus" occurs as a result of lower use of insurance benefits by the subscribers than was anticipated when the premiums were determined. There is no dispute that the District is the contract holder. The District argues that the terms of the rider control and only the amount in excess of its contributions must be applied for the sole benefit of the subscribers. Here the refund was $138,775.52, and all parties agree that the District paid more than that amount in premiums for the group coverage. The District maintains that the subscribers should receive refunds only when the surplus exceeds the amount paid by the District.

The district court rejected the District's interpretation of the rider on the following basis:

"Under the District's interpretation of the divisible surplus rider, NEA is only entitled to the portion of a refund that exceeds the District's share of the premiums. Thus, under the District's view, NEA would never receive a refund. For example, if an employer 'pays' the entire premium and the total for the year is $1,000,000, BC/BS would need to refund $1,000,001 in order for NEA to get a $1 refund. This would effectively read the divisible surplus language out of existence. And such language elimination is not permitted under Kansas law. See, e.g., *Garvey Center, Inc. v. Food Specialties, Inc.*, 214 Kan. 224, Syl. ¶ 3, 519 P.2d 646 (1974) (noting that '[r]esults which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided')."

We note that the district court's reasoning is inconsistent with the language of the rider and the structure of these types of insurance premiums. The court's interpretation ignores the express language of the rider providing that "[a]ny part of the Divisible surplus that is paid in cash and in excess of the Contract Holder's share shall be applied for the sole benefit of the Subscribers." According to the express language between the contracting parties, the District and BCBS, the entire "divisible surplus" under the facts as outlined above must be paid to the District.

The above conclusion does not resolve the issue dividing the parties. The rider is part of an agreement between BCBS and the District for the benefit of the insureds. The insured teachers, however, were not a party to the contract. Clauses such as the rider in this case are designed to protect the insurance company. Under such clauses, the insurance company may pay the divisible surplus to the contract holder and absolve itself against claims by individual insureds where the holder refuses to pay the individual insureds' claims. See *Peterson v. Colorado Springs*, 37 Co. App. 475, 477, 548 P.2d 1285 (1976) (holding that the provisions of the insurance policy did not entitle employees to a divisible surplus because it did not define the rights of the parties who made the premium contributions).

Both the District and BCBS entered into a contract providing a group policy of health insurance for members of the association, the professional teachers represented by NEA-C. The rider provisions of the contract provide a way for BCBS to distribute directly to the District divisible surpluses resulting from lower use of insurance benefits by the subscribers than was anticipated when the premiums were determined, without subjecting BCBS to further liability in the event the holder, the District, refuses to pay the subscribers. Neither NEA-C nor the insured teachers were parties to this contract. The agreement between BCBS and the District defines the rights and responsibilities of BCBS and the District but does not govern the rights in and to the divisible surplus between the District and NEA-C.

## B. *The Negotiated Agreements between NEA-C and the District*

The $138,775.52 surplus accumulated during the policy periods of November 1, 1990, through October 31, 1993. The health and medical insurance benefits were negotiated fringe benefits in the negotiated agreements between NEA-C and the District for the years 1991-92, 1992-93, and 1993-94. Thus, the agreements between the parties are set forth in the three negotiated agreements, and we must ascertain the parties intent with regard to the refund, if possible.

The agreements for both 1991-1992 and 1992-1993 state that the District "will provide employees with health and medical insurance at a cost not to exceed $175 per month per employee." The 1992-1993 amount was later increased to $187. The 1993-1994 negotiated agreement states that the District "will provide employees with health and medical insurance at no cost to the employees." If an employee declined health insurance benefits, he or she could not receive cash in its place, which distinguishes this case factually from *U.S.D. No. 259*. Moreover, if an employee declined health insurance benefits, he or she was not able to allocate any of the insurance benefit dollars to any other fringe benefit.

The district court, in interpreting these agreements, held that even under the District's interpretation, the District's share of the premium is really zero because it "bargained away the value associated with the cost of a single policy." The court reasoned that the teachers' salary was negotiated based upon their receipt of value of a single policy ($175 and $187). In the district court's opinion, the teachers effectively paid the cost of a single policy because the money the District used to pay for the policies would have otherwise been available for salary.

The District, however, observes that it agreed to provide employees with a single health insurance policy in an amount not to exceed $175 or $187 (1991-1993), or no specific amount (1993-1994). There is no dispute that the District fulfilled this obligation under the negotiated agreements.

NEA-C's position, adopted by the district court, is that the District was required, in one way or another, to pay out the full cost

of the policies. They argue that any refund of amount that the District agreed to spend in contract negotiations should go to the teachers.

The District responds by observing that it agreed to spend an amount *not to exceed* $175 and $187 in 1991 and 1992. In 1993, the District did not agree to spend any specific dollar amount. Instead, the District agreed to provide a single policy at no cost and it did so. Although it spent more than required for the policies, this does not run afoul of its agreements because it only agreed to provide a policy within a certain dollar figure.

The district court held that the teachers should receive the surplus as a matter of equity in that the District breached its duty of good faith and fair dealing because it acted in a way that undermined the teachers' ability to receive the full measure of their contractual rights. The District Court, thus, adopted the argument of NEA-C.

Both parties' arguments are persuasive. NEA-C views the contract and negotiations in terms of a fixed sum. In its view, the District has definite resources to allocate to salary and benefits. Those resources allocated to benefits directly reduce the resources available for salary and vice versa. The result of this process, according to NEA-C, is that the dollar amount attached to the health insurance expenditure is significant because it represents the amount that the District allocated toward teacher compensation as a whole. Therefore, a refund of that allocation to the District represents an unjust enrichment of the District and an effective bar to the teachers' receipt of what was allocated to them and bargained for during contract negotiations. If the District is allowed to keep the surplus, argues NEA-C, money allocated to teacher benefits goes into the District's coffers. However, this does not occur as a result of the District's behavior but rather as the result of teachers submitting fewer claims to BCBS than anticipated.

On the other hand, the District argues that it fulfilled its obligation by providing the insurance bargained for and the negotiated agreements required it only to provide such insurance. The District observes that the negotiated agreements demonstrate that it was the District's money that paid for the premiums. The District ar-

gues that the BCBS rider provision governs the distribution of the refund.

In response to the District's contention that its monies paid the premiums, we must observe that the situation in this case is different than that in which a private employer pays insurance coverage for its employees out of its corporate earnings. The funds which the District uses to pay for insurance premiums come from public taxes appropriated by the legislature for the education of the children in Kansas, including the payment of teacher salaries and benefits. Thus, it cannot be said that the District is entitled to the divisible surplus simply by virtue of the fact that it paid the premiums, especially where its behavior was not the reason for the divisible surplus.

What is clear is that the parties to the negotiated agreements did not provide in their contract for the refund. The District observes in its brief:

"The [negotiated agreements] herein are totally silent as to how an insurance refund is to be distributed. . . . The subject matter as to how an insurance refund is to be distributed has never been placed on the table for negotiations by either [NEA-C] or the [District]. The Court can take judicial notice that the [negotiated agreements], including those prior and subsequent to the time this lawsuit was commenced, do not contain any such provision."

NEA-C does not dispute this fact and agrees that the negotiated agreements are silent on the refund. Under these circumstances, our search to ascertain the intent of the parties in the agreements with regard to the refund in dispute would be fruitless.

The agreements contain a grievance procedure, but as indicated above in this opinion, such procedure is inadequate to resolve the dispute. The parties could have but did not include a provision for binding arbitration of such disputes as may arise involving the interpretation, application, or violation of such agreement. See K.S.A. 72-5424. Thus, the negotiated agreements between NEA-C and the District simply fail to provide any contractual resolution of the dispute before this court. Instead, we are faced with an omitted term. The Restatement (Second) of Contracts § 204 (1981), provides that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term

which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."

The Restatement notes that such an omission may come about in different ways. The parties may have expectations regarding a situation which arises but fail to manifest them, either because they are not consciously or are only partly consciously aware of the expectations, or because the situation seems unimportant or unlikely, or because discussion of the situation might be unpleasant or might produce delay or impasse. See Restatement (Second) of Contracts § 204, Comment b. An example of this type of omission is found in *Arrowhead Constr. Co. v. Essex Corp.*, 233 Kan. 241, 662 P.2d 1195 (1983). In that case, a building subcontractor discussed a price of $1.25 per square foot for a project with its general contractor. However, when presented with a contract at that price, the subcontractor refused to sign, instead informing the general contractor that the price under the circumstances would need to be $1.35 per square foot. The subcontractor performed the work without objection, and the price was never settled. 233 Kan. at 248. Citing the Restatement, this court found that the clear intent of the parties was to contract and the only term which was indefinite was the price. We then found, based upon evidence in the case from an expert in the field, that the price of $1.35 was reasonable under the circumstances. 233 Kan. at 249-50.

An omission may also come about because the parties to an agreement entirely fail to foresee the situation which later arises and gives rise to a dispute. Restatement (Second) of Contracts § 204, Comment b. In *Dato v. Mascarello*, 197 Ill. App. 3d 847, 557 N.E.2d 181, 145 Ill. Dec. 411 (1969), the court was faced with just such a situation where the parties failed to anticipate several months' delay in closing in their contract. The court noted:

"Plaintiff correctly argues that if a contract purports to be a complete expression of the intentions of the parties, courts should not add other terms about which the agreement is silent. [Citation omitted.] However, a written contract need not provide for every feasible contingency which might arise in the future to be enforceable. [Citation omitted.] . . . As stated in section 204 of Restatement (Second) of Contracts '[w]hen the parties to a bargain sufficiently defined to be a

contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.' (Restatement (Second) of Contracts, § 204, at 96-97 (1981).) The comments to section 204 explain that such an omission may occur when the parties to an agreement entirely fail to foresee the situation which later occurs and gives rise to the dispute. In such cases, they have no expectations with respect to that situation and a search of the agreement for their intentions regarding it would be fruitless. In those circumstances, a court may supply a term which it determines to be reasonable either by logical deduction from the agreed terms or on the basis of what comports with standards of fairness. The supplying of omitted terms which are essential to a determination of the rights and duties of the parties who have entered into an otherwise binding agreement is not technically 'interpretation' of the contract, since 'interpretation' involves the ascertainment of the meaning of the terms which are contained in the instrument but which are unclear or ambiguous. See Restatement (Second) of Contracts, §§ 200 through 204 (1981).

"As noted above, plaintiff, in arguing that the trial court erroneously resorted to rules of construction and principles of equity in this case, relies upon the general principles that a court should not undertake to construe a contract which is clear and unambiguous and which constitutes a complete expression of the parties' intentions. However, on appeal plaintiff admits that 'neither the parties, nor their attorneys, anticipated that the closing of the subject transaction would be delayed for almost seven months after the plaintiffs took possession of the premises. As a result, the contract is silent as to the rights and obligations of the parties under the circumstances which are now before this Court.' [Citation omitted.] The silence of the contract with respect to the unanticipated delay in closing, acknowledged by both parties, brings the case within the purview of section 204 of the Restatement." 197 Ill. App. 3d at 851-52.

In *Camden Iron & Metal, Inc. v. Bomar Resources, Inc.*, 719 F. Supp. 297 (D. N.J. 1989), Bomar Resources contracted with Camden Iron for the purchase and shipment of a large amount of scrap iron aboard a mutually agreed upon ship. However, the ship agreed upon turned out to be unsuitable for the transportation of scrap iron. In determining which party was responsible for damages, the court noted that an error of omission had occurred, or

"[f]ramed another way, the explicit contract language reflects an 'absence of expectation,' that is, both Camden Iron and Bomar completely failed to contemplate the potentiality that a vessel like the Kalli might be tendered and thus, neither party had any reasonable expectations concerning such a contingency to have warranted memorialization in writing." 719 F. Supp. at 305.

Citing the Restatement, the court resolved the case by determining that in accord with standard business practices, Bomar was responsible for providing a ship which was capable of hauling the purchased freight. See 719 F. Supp. at 306-10. Numerous other cases have also dealt with an omission where the parties have simply failed to foresee a situation which later arises. See *Williams v. Metzler*, 132 F.3d 937 (3d Cir. 1997) (parties failed to provide for allocation of taxes in settlement agreement); *National Audubon Society, Inc. v. Watt*, 678 F.2d 299 (D.C. Cir. 1982) (parties entered into a contract providing that a development would not proceed until Congress had adopted legislation either reauthorizing, modifying, or deauthorizing the project, but parties failed to consider effect of the stipulation when Congress failed to act at all on the project); *F.D.I.C. v. Cage*, 810 F. Supp. 745 (S.D. Miss. 1993) (parties failed to consider how note rate was to be calculated if bank on which the rate was based failed); *Dato v. Mascarello*, 197 Ill. App. 3d 847 (parties in contract for sale of property failed to provide for the contingency of a delay in closing); *Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Authority*, 7 Mass. App. 336, 387 N.E.2d 206 (1979) (parties entered into an agreement to design improvements for airport but contract failed to specify how designer would be paid if improvements were not built).

There is no question that the parties in this case intended their agreement to be a binding expression of their rights and duties regarding the health plan in question. However, the parties admit that the negotiated agreements entirely failed to foresee the possibility of the refund which now gives rise to their dispute. Deciding which party is entitled to the divisible surplus is essential in determining the parties' rights and duties under the contract. Under such circumstances, this court should supply a term which is reasonable in the circumstances. Restatement (Second) of Contracts § 204.

Had the parties, as in *Arrowhead*, manifested some evidence of their expectations, our task would be easier. But as the Restatement notes: "[W]here there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of

the bargaining process." Restatement (Second) of Contracts § 204, Comment d.

Thus, it is left to this court to decide, as a matter of community standards of fairness and policy, which of the parties is entitled to the divisible surplus. In reaching our decision, we revisit the only other Kansas case concerning a divisible surplus, *U.S.D. No. 259*. Although *U.S.D. No. 259* is factually and legally distinct from the case at hand, we consider that this case addresses community standards of fairness and policy.

In *U.S.D. No. 259*, BCBS refunded a divisible surplus in the amount of $354,839.83 to the school district in accordance with its contractual obligation. U.S.D. No. 259 brought a declaratory judgment action to determine what should be done with the surplus. The surplus was generated, as it was in this case, as a result of a lower use of insurance benefits by the subscribers than was anticipated when the premiums were determined. A negotiated contract with its professional employees obligated U.S.D. No. 259 to enter into a group health insurance contract. U.S.D. No. 259 agreed to provide $60 (and later $65) worth of health insurance coverage to its employees. Unlike the negotiated agreements in this case, employees who declined the health insurance received that amount, either $60 and later $65, in extra salary. U.S.D. No. 259 contracted with BCBS for this group coverage. The contract had a divisible surplus rider almost identical to the one in this case.

The question in *U.S.D. No. 259* was which subscribers would benefit from the surplus.

In *U.S.D. No. 259* this court said: "Where a contractual provision in a group health insurance plan specifies the method of distribution of a divisible surplus, that provision controls." 239 Kan. 76, Syl. ¶ 2. However, U.S.D. 259 did not claim entitlement to the surplus, and the issue of entitlement between one school district and teachers was not decided by *U.S.D. No. 259*. We held that "the surplus occurred as the result of lower use of insurance benefits by the subscribers than was anticipated when the premiums were determined. The subscribers overpaid their premiums. Hence, those who overpaid their insurance premiums created the surplus and should receive the refund." 239 Kan. at 80.

Regardless of whether the teachers or the District actually paid for the group health insurance, there is no dispute that the divisible surplus was created by the actions of the subscriber-teachers in filing fewer and/or smaller claims than were anticipated when BCBS set the premiums. The divisible surplus is wholly a product of their actions rather than anything that may be attributed to the District. Consistent with the policy set forth in *U.S.D. No. 259*, we conclude that in the absence of a contract provision addressing the rights of the parties in this situation, those whose conduct generated the refund, the teachers, are entitled to the refund.

Although the district court's decision rested on *U.S.D. No. 259* as well as other equitable grounds, the decision reached the right result and is affirmed. See *Bank of Kansas v. Davison*, 253 Kan. 780, 792, 861 P.2d 806 (1993).

Affirmed.

SIX, J., dissenting: NEA-Coffeyville (NEA-C) sought a declaratory judgment. The claim was unjust enrichment, asserting that "[p]rinciples of equity and fundamental fairness dictate that the District distribute the full BCBS refund to the BCBS group contract subscribers." The six intervenors sought similar relief.

The pretrial order reflects:

"Additionally, Plaintiff and Intervenors believe that they amended their respective Petitions by deleting any inference that they allege Defendant violated an explicit provision contained in any relevant Negotiated Agreement between NEA-Coffeyville and USD No. 445. Defendant does not believe that this action was approved during the pretrial hearing."

At trial, the district resolved the question by permitting the amendment. We do not have a contract action here. The district court sets our stage by finding "NEA's claim is based on equitable principles and the divisible surplus rider, neither of which is subject to the grievance procedures." NEA-C has not sued on the negotiated agreements (contracts) for breach of contract, express or implied. On the contrary, all agree that the District has fully performed under the three contracts.

The district judge analyzed the three contracts and the rider in crafting relief for the plaintiffs grounded in the "[p]rinciples of

equity." The majority disapproves of the district court's interpretation of the rider and abandons the equity rationale. On those points, I agree with the majority. But where does such disapproval and abandonment leave our appellate court analysis? We are reviewing a declaratory judgment action that was resolved below by relying not on contract principles but on equity. The majority, in rejecting the district court's equity rationale, *sua sponte* crafts a solution by calling in the Restatement (Second) of Contracts § 204, "Supplying an Omitted Essential Term" (1981). Reliance on the Restatement to resolve an equity action is puzzling. I pose two objections, the first on procedural grounds, the second on substance.

My procedural objection focuses on the propriety of supplying a rule of law *sua sponte* in the opinion-writing phase of appellate decision-making. I am apprehensive of an appellate procedure that invokes a theory *sua sponte* to end the parties' dispute without the parties having had an opportunity for comment, particularly here, where the claims of unjust enrichment and equity carried the case from the day of filing to the day of district court resolution. I believe both counsel and the district judge will be surprised to read that § 204 of the Restatement (Second) of Contracts has decided the case. Each member of this court should have the benefit of the parties' analysis on the applicability of § 204 to this controversy before issuing a § 204 opinion.

My substantive objection keys on the majority's § 204 discussion. The contracts were entered into in 1991 through 1993. The problem with basing relief on § 204's "gap filling," is that NEA-C has neither sued for breach of contract nor sought judicial reformation of the negotiated agreements. All of the § 204 foreign authorities cited by the majority are breach of contract cases.

The majority next turns to *Arrowhead Const. Co. v. Essex Corp.*, 233 Kan. 241, 662 P.2d 1195 (1983), in developing its "omitted term" resolution. *Arrowhead* involved, among other questions, a contract for carpentry work. The carpenters, Crotts and Henley, informed Arrowhead, the subcontractor, that they required payment of $1.35 per square foot, not $1.25 as Arrowhead had stated in the written contract. Neither Crotts nor Henley signed the con-

tract; however, they continued to work until they realized they were not going to be paid.

This court looked to the Restatement (Second) of Contracts § 33. The question was the reasonableness of the price. Crotts and Henley, after stating their price of $1.35, continued working without objection from Arrowhead. According to the testimony, $1.35 was extremely reasonable. The question was whether the parties had agreed on the essential term of *price*, with Arrowhead claiming no agreement. We found Arrowhead's claim "without merit." 233 Kan. at 250. We said: "The Restatement assumes courts will, in such instances, supply a term which is 'reasonable in the circumstances.' (See Section 204). This term should be one which 'comports with community standards of fairness and policy. . . .' Comment d., § 204." 233 Kan. at 249.

The testimony in *Arrowhead* as to reasonableness of price led to our reference to § 204 and Comment d. *Arrowhead* does not support the result here. The majority has not substituted a "term." It has created an entire provision in a contract and substituted a theory of recovery for plaintiffs that requires paragraphs to explain.

The District and NEA-C negotiated for salary plus a single health insurance policy. The District agreed to pay the respective salaries and provide a single health insurance policy. These two provisions of the contract were separate. The health insurance benefit is not included in the salary section of the agreement. The parties admit they did not contemplate a divisible *surplus* when they entered into the contracts. The parties also admit these 3-, 4-, and 5-year-old contracts have been fully performed by all. NEA-C itself refers to the contracts as "long since expired." Despite this, the majority reasons that the contracts have an "essential omitted term" that must be supplied by this court. The majority's position contradicts our time-honored rules of contract interpretation.

The function of a court is to enforce a contract as it is made by the parties, not to create a contract for them which is in accord with the court's own notions of what the contracting parties wisely should have done. *Froelich v. United Royalty Co.*, 179 Kan. 652, 654, 297 P.2d 1106 (1956). Courts cannot read words into a contract which import an intent wholly unexpressed when the contract

was drawn and executed. *Potter v. Northern Natural Gas Co.*, 201 Kan. 528, 532, 441 P.2d 802 (1968) (quoting *Williams v. Safeway Stores, Inc.*, 198 Kan. 331, 344, 424 P.2d 541 ([1967]). Courts cannot make an agreement for the parties which they did not make themselves. *Williams*, 198 Kan. at 344; *Smith v. Holmes*, 181 Kan. 438, 441, 312 P.2d 228 (1957) (quoting *Anderson v. Rexroad*, 175 Kan. 676, 679, 266 P.2d 320 [1954]). Courts cannot and should not remake contracts. *Hanscome v. Coppinger*, 183 Kan. 623, 626, 331 P.2d 590 (1958). We should not write a new contract for the parties under the guise of interpretation in order to achieve some equitable result. *Morgan v. Mobil Oil Corp.*, 726 F.2d 1474, 1477 (10th Cir. 1984) (applying Kansas law); *Davenport v. Dickson*, 211 Kan. 306, 312, 507 P.2d 301 (1973); *Wood v. Hatcher*, 199 Kan. 238, 243, 428 P.2d 799 (1967). We are not at liberty to revise an agreement to implement an unexpressed intention. 17A Am. Jur. 2d, Contracts § 340.

The majority acknowledges the factual distinction between *U.S.D. No. 259 v. Kansas National Education Ass'n*, 239 Kan. 76, 716 P.2d 571 (1986), and this case. The factual distinction is significant. Recall that the teachers in *USD No. 259* had the option of receiving their $60 and $65 insurance premium in cash as salary. The teachers here did not. Importantly, the U.S.D. No. 259 negotiated agreement (contract) said:

" 'Paragraph 2: *If a teacher enrolls* in the Board provided group health insurance plan and the Board contribution exceeds the amount of the health insurance premium in the plan selected, *then such excess shall be paid to that teacher as extra earnings in regular payroll checks and shall be subject to all applicable deductions.*

" 'Paragraph 3: *If a teacher does not* enroll in the Board provided group health insurance plan, *the Board shall contribute $60 per month for each teacher employed full time.* Such contribution *shall be paid to that teacher as extra earnings in regular payroll checks and shall be subject to all applicable deductions.' "* 239 Kan. at 77. (Emphasis added.)

U.S.D. No. 259 did not claim entitlement to the surplus. *U.S.D. No. 259* is of questionable precedential value here.

The District did not expressly agree to spend all of the $175 and $187 on health insurance in the negotiated agreements or any other

written instrument. The District simply agreed to provide a single health policy with the understanding that it would not spend more than $175 in 1991-92 or $187 in 1992-93. In the 1993-94 negotiated agreement, there is no stated dollar figure at all. Nothing expressed in the contracts supports a recovery by the teachers.

The majority cites *Peterson v. Colorado Springs*, 37 Colo. App. 475, 477, 548 P.2d 1285 (1976), which is consistent with my substantive objections and contrary to the result here. *Peterson* held that a provision of an insurance policy did not entitle employees to a divisible surplus because it did not define the rights of the parties who made premium contributions.

The District suggests in its brief that some present and former employees who paid BCBS premiums with personal funds *"may be entitled to a share of the refund because the refund is in part based upon their personal contributions."* This category of employee would have elected coverage beyond single premium coverage. Further, in oral argument, the District admitted that retired employees who paid 100% of their single premium coverage would be entitled to a portion of the surplus. I characterize the District's suggestions as a concession. I would reverse the district court and remand for a determination of any such employee's personal premium payment. The remainder of the disputed funds belongs to the District.