No. 81,073

National Education Association-Topeka, Kansas Corporation; and
PENNY ROBERTS, LINDA BAKER, and LESLIE KUHNS, Individ-
ually and For All Persons Similarly Situated, *Appellants*, v.
UNIFIED SCHOOL DISTRICT No. 501 and BLUE CROSS AND
BLUE SHIELD OF KANSAS,. INC., *Appellees.*

(7 P.3d 1174)

Opinion filed July 14, 2000.

*Stephen W. Cavanaugh*, of Fisher, Cavanaugh, Smith & Lemon, P.A., of Topeka, argued the cause, and *Richard D. Anderson*, of Anderson Law Offices, of Topeka, and *David M. Schauner*, of Kansas National Educational Association, were on the brief for appellants.

*Patricia E. Riley*, of Weathers & Riley, of Topeka, argued the cause, and was on the brief for appellee Unified School District No. 501.

*William H. Pitsenberger*, general counsel, was on the brief for appellee Blue Cross and Blue Shield of Kansas, Inc.

The opinion of the court was delivered by

SIX, J.: The dispute here is over entitlement to a health insurance premium "divisible surplus" refunded to Unified School District No. 501 (the District) by Blue Cross Blue Shield of Kansas, Inc. (BCBS). Plaintiffs National Education Association-Topeka, Inc., Penny Roberts, Linda Baker, and Leslie Kuhns, individually and for all persons similarly situated, (NEA-T) claim the surplus. NEA-T sued the district and BCBS seeking declaratory relief under K.S.A. 60-1705 (allowing judicial construction of a contract in event of a breach), class certification, mandamus, and damages under the Kansas Tort Claims Act. The trial court granted summary judgment to the District, ruling that NEA-T was required to follow the employment contract grievance procedure. The claims against BCBS were dismissed. NEA-T appeals.

Our jurisdiction is under K.S.A. 20-3018(c) (a transfer from the Court of Appeals on our own motion).

The questions before us are whether the trial court erred in ruling: (1) NEA-T was required to follow the grievance procedure, (2) the action is now time barred, (3) the issue of class certification was moot after dismissal of NEA-T's claims, (4) NEA-T's claims for breach of fiduciary duty, conversion, and unjust enrichment, as well as the claim against BCBS, should be dismissed.

Finding no error, we affirm.

## FACTS

NEA-T is a nonprofit corporation organized for, among other things, conducting professional negotiations and protecting the conditions of teacher employment under K.S.A. 72-5414. NEA-T is the recognized exclusive bargaining representative of professional employees of the District under the Professional Negotiations Act, K.S.A. 72-5413 *et seq.* Penny Roberts, Linda Baker, and Leslie Kuhns are professional employees of the District.

NEA-T and the District regularly enter into Professional Agreements (PA's). These agreements set forth the terms and conditions of professional employment. At issue here are the PA's for 1993-1994 and 1995-1996. Both PA's contained Article 41, entitled Fringe Benefits, which says in part:

"The Board of Education shall establish for all eligible professional employees a fringe benefit program (hereinafter referred to as "Cafeteria Plan") pursuant to Section 125 of the Internal Revenue Code of 1986, as amended, and regulations issued thereunder.

"A. Each professional employee performing the equivalent of fifty percent (50%) or more of a full-time position shall be eligible to participate in the Defined Health Insurance and Cafeteria Plan.[1]

Professional employees who are hired to begin employment or who otherwise become eligible for benefits for the first time for the 1989-90 school year, or thereafter, will automatically receive coverage of a single low option Defined Health Insurance Plan and the difference, if any, in cash between a single low option health insurance plan and $166.68. In the event that the low option monthly premium exceeds $166.68, the employee will pay the difference. Such professional employees may decline the health insurance, but will only receive the difference in cash between the low option health insurance and $166.68.

[1] The annual Board of Education paid fringe benefit contribution of $166.68 monthly will be added to each eligible professional employee's compensation and shall thereby increase such employee's total compensation."

Under Article 41 of the PA's, the District executed a group contract with BCBS to provide employee health insurance. Roberts, Baker, and Kuhns were covered. The contract has a "divisible surplus rider" ("Rider") which governs the distribution of any divisible surplus held by BCBS at the end of a plan year. A "divisible surplus" occurs because of a lower use of insurance benefits by the subscribers (insureds) than was anticipated when the premiums

were determined. *U.S.D. No. 259 v. Kansas-National Education Ass'n*, 239 Kan. 76, 80, 716 P.2d 571 (1986). The surplus here accumulated during the policy period of August 1, 1993, to July 31, 1995, and August 1, 1995, to July 31, 1996. BCBS provides the District with two types of plans, a low-option plan and a high-option plan. On the cover sheet of each contract between the District and BCBS, the Contract Holder is defined.

Articles 9 and 10 of the PA's govern the grievance procedure for the resolution of problems concerning the interpretation and application of the PA. The PA provides for a formal grievance procedure or in the alternative an oral complaint to a principal at any time without initiating a formal grievance procedure. If the problem is not resolved, the grievance may be submitted to an arbitrator if the application or interpretation of the PA is involved.

The District contracted with NEA-T to offer a fringe benefit program to professional employees. The District also created a "Cafeteria Plan" to allow professional employees to structure their benefits as they desired. See 26 U.S.C. § 125 (1994). A cafeteria plan is defined as a "[t]ype of fringe benefit plan whereby [the] employee, in addition to receiving certain basic fringe benefits, is permitted to also select and structure certain other types of benefits up to a specified dollar amount." Black's Law Dictionary 203 (6th ed. 1990.) The health insurance fringe benefit package here was $166.68 per month.

The PA's during the relevant period referred to the $166.68 monthly payment at issue as a "Board of Education paid fringe benefit contribution." The cafeteria plan refers to the single low-option insurance as a "Board-paid defined benefit" and the District's communications with its employees consistently break down the premium payments into "employee paid" and "board paid" portions.

In 1994, BCBS refunded to the District $731,046.47 as divisible surplus. The District distributed half of this amount among plan participants including the three individual plaintiffs. The remainder was placed in a premium stabilization fund to adjust future premiums. In 1995, the refund to the District was $1,007,678. The District retained $395,000 ($15,000 for an employee wellness fund

and $380,000 to adjust future premiums). The remainder of the surplus was distributed to insureds, including Roberts, Baker, and Kuhns. The District presently offers both health insurance plans and flexible savings accounts as optional benefits under its cafeteria plan. The divisible surpluses at issue here arose from health insurance plans, not flexible spending accounts. Before the District decided the distribution of the surpluses, it alerted its employees to the surpluses and discussed disposition at length in its insurance committee. NEA-T representatives were participants on the insurance committee. The District's distribution decisions were made in public meetings.

## THE TRIAL COURT'S RESOLUTION

The trial court said:

"The disagreement between the District and Plaintiffs centers on the interpretation of the PA. Before 1989, employees who opted out of a group insurance plan received $166.68 in cash. Now the PA states that employees hired after 1989 who opt out of the group insurance plan will only receive in cash the difference between a single low option plan and $166.68. Therefore, a question remains whether the insurance plan fringe benefit is to be construed as part of an employee's total salary and thus when part of that salary is not used for insurance premiums it should be paid back to the employee or whether only the difference between the cost of a single low-option health insurance plan and $166.68 is considered part of an employee's compensation and therefore, when part of that compensation is not used toward insurance premiums, an employee is entitled to it. Because this case's predominate issue involves the interpretation of the PA and because the parties have agreed to arbitration and the District has moved for arbitration, the Court concludes that arbitration is the proper forum for Plaintiffs' complaint. Therefore, the Court remands Plaintiffs case against USD to arbitration as this Court favors arbitration. [Citations omitted.]"

### As to the codefendant BCBS, the trial court reasoned:

"BCBS also requests this Court to dismiss NEA-T's claims against it for failure to state a claim upon which relief can be granted. The Court grants this motion and on its own motion dismisses all of Plaintiffs' claims as to BCBS. As the Court has found, USD 501 is the 'Contract Holder' in the group insurance contract. Therefore, BCBS has not breached any contractual duty by remitting the divisible surplus to the District. The rest of Plaintiffs' claims against USD 501 are determinative on an interpretation of their professional agreement, as to which BCBS was not a party. Thus, the Court concludes that Plaintiffs have no claim for relief against BCBS."

The District then moved to amend the trial court's findings and conclusions that:

1. The District has moved for arbitration;
2. arbitration *is* the proper forum;
3. the case should be remanded to arbitration.

In ruling on the motion, the trial court said:

"The Court agrees with the District. USD 501 never moved for arbitration. It only argued in its Motion for Summary Judgment that arbitration was the correct forum for Plaintiffs' complaint. The Court agreed but failed to recognize that Plaintiffs missed the deadline for filing for arbitration so the remand order was incorrect. According to Article 9 of the PA, Plaintiffs had 15 school days after the act or occurrence to file their complaint with the Assistant Superintendent of Personnel Services. Although demand letters were written by David M. Schauner, KNEA General Counsel, and Penny Roberts, President of NEA, to Joseph Zima, these letters were not written in a timely fashion and not in accordance with Article 9 of the PA. Thus, Plaintiffs failed to file a timely grievance. Therefore, the Court amends its order so as to delete the finding that the District had moved for arbitration. The Court also deletes the order of remand because the Plaintiffs failed to follow the grievance procedure outline in the PA and never requested arbitration.

"Plaintiffs in their motion argue that the Cafeteria Plan, in particular Article IV, 4.2, the divisible surplus rider and the Internal Revenue Service Rules are the relevant focus for legal interpretation on the issue of compensation in this dispute rather than the Professional Agreement which does not even cover all the plan participants who may be entitled to a portion of the refund. The Court disagrees. All the Plaintiffs in this case are professional employees and the insurance contracts at issue cover plans for professional employees. Thus, the professional agreement controls the plan participants at issue in the present case. Also, the Cafeteria Plan, Article 4.2 and IRS regulation 1.125-2(b)(7) are not the relevant focus for interpretation. Article 4.2 of the Cafeteria Plan states in part, USD 501 will add to the compensation of each Participant who is a Professional Employee a fringe benefit contribution *in accordance with the current Professional Agreement* entered into between [U.S.D.] 501 and NEA-Topeka, Inc.,' and IRS regulation 1.125(b)(7) uses discretionary language and thus is not controlling. Therefore, the Court affirms its previous finding that the dispute at issue involves an interpretation of the PA. Therefore, arbitration was the proper forum for this dispute. However, since Plaintiffs failed to follow the grievance procedure in place, arbitration is no longer an alternative. Thus, Plaintiffs' request that the Court maintain jurisdiction during the pendency of the arbitration to protect the rights of putative class members is now moot, in that, the remand order was incorrect.

. . . .

"In conclusion, the Court amends its Memorandum Decision and Order deleting its finding that the District moved for arbitration and dismissing its order of remand. Because all of Plaintiffs' claims involve an interpretation of the PA and because Plaintiffs have failed to submit their grievances to arbitration as required by the PA, the Court grants the District's Motion for Summary Judgment. The Court also affirms its order dismissing all of Plaintiffs' claims against BCBS."

## DISCUSSION

Oral argument in this case was held in September, 1999. One member of the court recused. In an unpublished opinion filed October 29, 1999, we held that because we were equally divided, the judgment of the trial court controlled. See Kan. Const. art. 3, § 2; *Pierce v. Pierce*, 244 Kan. 246, 767 P.2d 292 (1989); *Paulsen v. U.S.D. No. 368*, 239 Kan. 180, 182, 717 P.2d 1051 (1986). We granted the NEA-T's motion for rehearing on December 22, 1999. Senior Judge James W. Paddock was appointed to participate in the decision on rehearing.

*NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 996 P.2d 821 (2000), was filed January 28, 2000. *NEA-Coffeyville* is also a school district/BCBS divisible surplus case. In *NEA-Coffeyville*, we affirmed the trial court's order returning the surplus to the insureds. *NEA-Coffeyville* controls certain aspects of this case. After reviewing *NEA-Coffeyville*, the District here moved to file a supplemental brief addressing the distinction between *NEA-Coffeyville* and this case. The motion was granted. We have received supplemental briefs from both the District and the NEA-T on the question. The case is now ready for decision by a full court.

Our standards for reviewing summary judgment are well known. See *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999). The interpretation of a written instrument is a question of law; thus, we have de novo review of the written instruments here. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998).

### NEA-T's Contentions

NEA-T contends that the insureds are entitled to 100% of the surplus. Initially, it based its claims on the PA. NEA-T argued that the contract with BCBS resulted from the District's obligations to provide health insurance to professional employees under Article

41 of the PA. When the District raised the PA's mandatory grievance procedure as an affirmative defense, NEA-T shifted its focus. In an amended petition, NEA-T relied on the Rider, District policy, and the cafeteria plan. However, in its factual statements in the amended petition, NEA-T continued to rely on the PA. NEA-T argued the District: (1) established the cafeteria plan, and (2) contracted with BCBS, both as a result of its obligations under Article 41 of the PA. Because it did not follow the grievance procedure in the PA, the trial court dismissed NEA-T's claims. NEA-T continues to argue that entitlement to the surplus is based not on the PA, but on District policy, the cafeteria plan, and the Rider.

According to NEA-T, the Rider represents a refund by BCBS of overpaid premiums. The overpayment occurs when the premiums collected for a plan year exceed total claims, expenses, and reserves for that year. NEA-T reasons any BCBS divisible surplus must be distributed to the insureds. NEA-T initially claimed it was entitled to the surplus because insureds were the "Contract Holder." NEA-T now contends that even if the District is the Contract Holder, the BCBS Rider mandates application of the surplus to the insureds. NEA-T also argues that according to a 1994 policy of the District (# 4500), any divisible surplus was to be returned to the insureds. Policy # 4500 is not controlling and is addressed later in the opinion.

NEA-T argues: (1) The contributions to the insurance premiums are employee contributions, (2) the PA requires the district to provide all employees with a single-low option health plan and the difference in cash between a low-option health plan and $166.68, (3) the insurance plan is part of an employee's total compensation, and (4) the District's "contributions" are paid out of employee salaries. NEA-T reasons the District has made no contributions to the group insurance plans and, therefore, the entire surplus should be remitted to the insureds.

NEA-T agrees with the trial court that entitlement to the divisible surplus refund depends upon whether the premium paid to BCBS was funded by employee compensation or the District. However, NEA-T argues that the trial court erred in determining that resolution of the dispute required interpretation of the PA.

NEA-T contends that entitlement to the divisible surplus depends only upon interpretation of the cafeteria plan and Rider. Specifically, NEA-T maintains on appeal that the Rider creates the obligation to refund the divisible surplus, not the PA.

### The District's Contentions

The District counters, asserting: (1) Resolution involves the interpretation and application of the PA, (2) the parties have agreed to submit such a grievance to arbitration, and (3) the trial court does not have jurisdiction.

According to the District: (1) The cafeteria plan is not a contract with professional employees, (2) the cafeteria plan flows from the District's obligations under the PA, (3) the District was given full discretion to set up the cafeteria plan (which merely states the employees' options with respect to their fringe benefit package), (4) the health insurance programs set out in the cafeteria plan are the result of a contract between the District and BCBS, (5) the Rider is a supplement to the contract between the District and BCBS, (6) the cafeteria plan does not govern entitlement to the divisible surplus—the Rider does, (7) if the Rider entitles the District to the surplus—then the District is only required to pay the surplus to its employees if it has agreed to do so by contract, and, thus, (8) if the professional employees have any right to the surplus, that right flows from the PA.

The District argues the Rider only provides that the portion of the divisible surplus "that is paid in cash and is in excess of the Contract Holder's share of the premiums shall be applied for the sole benefit of the insureds." Therefore, the District says it had the right to retain the portion of the divisible surplus representing the premiums it contributed.

The District contends it had no obligation to pay out any of the 1993-94, 1994-95 divisible surplus because the surplus belonged to the District. The District reasons its distribution of part of the surplus for both years to the insureds was purely discretionary. For the 1993-1994 policy year, the District paid $2,739,535.28 in health insurance premiums. The District remitted an additional $1,789,243.54 in salary deductions for employees who opted for

coverage other than the single low-option plan. In 1994, the District received a $731,046.47 divisible surplus. According to the District, its share of the premiums was $2,739,535.28; thus, the amount of the divisible surplus "in excess of the Contract Holder's share" was zero. For 1994-1995, the District received a $1,007,678 divisible surplus. It paid $2,937,289.15 for premiums and an additional $1,577,382.65 in salary deductions (again for covered employees choosing a plan other than a single low-option health plan). Again, the divisible surplus "in excess of the Contract Holder's share" was zero.

## The Rider

Each party's argument invites an initial examination of the Rider. The Rider says in part:

"A.    Divisible Surplus Defined. Divisible Surplus means the income derived from premiums for the benefits of this Group Contract and which is available for a retroactive adjustment of premiums.

. . . .

"C.    Distribution of Divisible Surplus.
Divisible Surpluses distributed in this manner:
1. To meet the Contract Holder's minimum group reserve needs (if any) for the benefits of the Group Contract.
2. The remainder, if any, is paid in cash to the Contract Holder or upon written request applied as an adjustment of future premiums."
"Any part of the Divisible Surplus that is paid in cash and is in excess of the Contract Holder's share of the premiums shall be applied for the sole benefit of the Insureds."

The Rider at issue here is identical to the Rider in *NEA-Coffey-ville*. See 268 Kan. at 392-93. The trial court here ruled that the "Contract Holder" is the district. NEA-T has not appealed that ruling. Because the District is the Contract Holder, it was proper for BCBS to refund the divisible surpluses to the District. This is consistent with our holding in *NEA-Coffeyville*, where we said: "According to the express language between the contracting parties, the District and BCBS, the entire 'divisible surplus' under the facts as outlined above must be paid to the District." 268 Kan. at 394. The Rider does not entitle NEA-T to the surplus. Thus, if an

NEA-T entitlement exists, it must flow from some other source. NEA-T contends the cafeteria plan is that source.

## The Cafeteria Plan

According to NEA-T, the cafeteria plan *defines* total compensation and allows the employee to elect benefit options. The cafeteria plan explains how employees may structure their benefits. One benefit is the $166.68 fringe benefit provided for by the PA. Article 4.2 of the cafeteria plan says in part: "U.S.D. 501 will add to the compensation of each Participant who is a Professional Employee a fringe benefit contribution *in accordance with the current Professional Agreement* entered into between U.S.D. 501 and NEA-Topeka, Inc."

The trial court held that the cafeteria plan's language invites an interpretation of the PA. The cafeteria plan specifically refers to the PA. Standing alone, the cafeteria Plan does not dictate NEA-T's entitlement to the divisible surplus. The employees' rights under the cafeteria plan are contingent on how those rights are defined in the PA. The District is contractually bound to provide the $166.68 monthly fringe benefit to professional employees. The *source* of that obligation derives from the PA, not the cafeteria plan. NEA-T understood this source, since its amended petition says that the District "agreed to establish" the cafeteria plan under Article 41 of the PA. The cafeteria plan, without the PA, cannot support a claim that NEA-T is entitled to the surplus.

## Board Policy 4500

NEA-T also argues that Board Policy 4500 directed that premium refunds be returned to the insureds. NEA-T's Policy 4500 argument has no bearing on the question for decision. The policy does not create an entitlement to the surplus. The Rider is the operative instrument with respect to the initial distribution of the surpluses. We have said: "Where a contractual provision in a group health insurance plan specifies the method of distribution of a divisible surplus, that provision controls." *U.S.D. No. 259*, 239 Kan. 76, Syl. ¶ 2. The Rider specifies the method of distribution of the

divisible surplus but does not govern NEA-T's rights, if any, to it. See *NEA-Coffeyville,* 268 Kan. at 394.

## IRS Regulations

NEA-T claims that the District must comply with IRS regulations with respect to cafeteria plans. NEA-T points to "proposed regulation § 1.125-2(b)(7)" which, according to NEA-T, states that where there is a surplus, an employee whose compensation was initially reduced to purchase the coverage should receive a cash refund. The District responds by correctly observing that the cited IRS regulation cited applies to flexible spending accounts (FSA's). The District offers both FSA's and health insurance plans under its cafeteria plan. The divisible surpluses here were generated by health insurance plans, not FSA's. Even if the surpluses were generated by FSA's, the regulation does not support NEA-T's position. Under the tax code, employer contributions to insurance programs are not treated as NEA-T asserts. 26 C.F.R. § 1.106-1 (1999) states that employer contributions are treated as funds given directly from the employer to the insurer so that the employee pays no income tax on the benefit.

Significantly, NEA-T admits that the Rider conformed to this treasury regulation. NEA-T also admits the premium surplus can be returned to those who paid the premium and created the surplus. The question again is: Who paid the premiums? The trial court ruled that the question of who paid the premiums and created the surplus requires interpretation of the PA. That ruling was correct and is consistent with our approach in *NEA-Coffeyville.* See 268 Kan. at 395-96. The Rider does not state whether the premiums are paid from employer contributions or employee salary reductions. The cafeteria plan is dependent upon the PA. If any written instrument obligates the District to pay any surplus to the insureds, it is the PA. See *NEA-Coffeyville,* 268 Kan. at 395-402 (analyzing the negotiated agreement to determine entitlement to the divisible surplus).

## The Grievance Procedure

The next issue for resolution is whether NEA-T is time-barred from seeking an interpretation of the PA. Parties who agree to

submit to contractual grievance procedures must invoke those procedures or be barred from claiming the benefits of their agreement in court. See *Atteberry v. Ritchie*, 243 Kan. 277, 285, 756 P.2d 424 (1988).

According to the express terms of each PA at issue here, any employee claiming a violation of the PA must present a grievance in writing. A grievance is defined as "a complaint by a professional employee . . . involving the interpretation or application of any provision contained within this Agreement." A grievance must be signed by the aggrieved employee and filed at Step 1 of the grievance procedure. (Article 9, section A of the PA.) The grievance must be filed within 15 school days following the act or occurrence which is the basis of the complaint. If the grievance is not resolved at Step 1 of the procedure, the employee may continue on to Step 2 which is an appeal to the Superintendent of Schools. A grievance not settled by the Superintendent may be submitted for arbitration under PA Article 10.

Binding arbitration of disputes may be included in agreements between school districts and teachers where the dispute involves an interpretation, application, or violation of the agreement. K.S.A. 72-5424(a). Where parties have unambiguously agreed to submit all questions involving the interpretations of their contracts to an arbitrator, the function of the courts is limited. *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 36-37, 98 L.Ed.2d 286, 108 S. Ct. 364 (1987).

Contrary to NEA-T's argument, the trial court did not rule that this dispute must be arbitrated. The trial court held NEA-T failed to timely act under Article 9; thus, arbitration was no longer an option. The trial court dismissed the case because the NEA-T failed to file a timely grievance and never requested arbitration.

NEA-T also contends that under the PA, issues of timeliness must be submitted to the arbitrator. This is correct. However, NEA-T cannot at this point even ask to submit the dispute to an arbitrator, because it failed to initiate the mandatory two-step process in Article 9. NEA-T has not alleged that it filed a timely grievance so that it could now ask an arbitrator to decide the question of timeliness. There is no reasonable argument that NEA-T could

submit the question of timeliness to an arbitrator. Where a party makes no attempt to invoke mandatory contractual grievance procedures, it is barred from then suing to enforce the contract. *Atteberry*, 243 Kan. at 285.

NEA-T claims that the trial court erred in determining arbitration is no longer available. This argument is without merit. NEA-T does not contend that it complied with the grievance procedure. As a result, NEA-T has not appealed the trial court's ruling that it failed to comply with the Article 9 grievance procedure. Compliance with Article 9 is a mandatory prerequisite to arbitration.

## Class Certification

NEA-T disagrees with the trial court's ruling that class certification was moot. Interpretation of statutory requirements is a question of law. We have unlimited review. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d 1366 (1997).

K.S.A. 60-223(c) requires a trial court to determine whether an action is to be maintained as a class action before a decision on the merits. NEA-T contends the trial court erroneously ruled on the merits of the case before ruling on the issue of class certification. NEA-T cites no cases in support of its position.

NEA-T acknowledges it agreed to postpone its motion to certify until the trial court decided the summary judgment motions. This acknowledgment is significant. If NEA-T agreed to postpone its motion, the motion was not actively pending before the court until after the court issued its decision on the merits. At that point, summary judgment had been granted in favor of the District, and BCBS was dismissed from the case. The trial court properly ruled that the issue of class certification was then moot. A party may not invite error and then complain of that error on appeal. See *Hawkinson v. Bennett*, 265 Kan. 564, 590, 962 P.2d 445 (1998).

## Breach of Fiduciary Duty, Conversion and Unjust Enrichment

NEA-T also contends that the trial court erred in concluding that the alleged tort claims required an interpretation of the PA.

The trial court held:

"Plaintiffs' tort actions against the District also depend on the interpretation of the PA. Whether the District breached its fiduciary duty to pay out the funds to plan participants and whether the District has unlawfully converted the funds or been unjustly enriched by the funds, depends on whether the insurance plan fringe benefit is to be construed as part of a professional employee's total salary or whether only the difference between the cost of a single low-option health insurance plan and $166.68 is considered part of an employee's compensation. Without this interpretation through arbitration, the Court cannot decide whether the employer District has held any funds unlawfully. Therefore, the proper forum for resolution of Plaintiffs' tort claims was arbitration and thus, since Plaintiffs have failed to timely move for arbitration, the Court holds their tort claims must also be dismissed."

The District contends that NEA-T has no standing to bring tort claims. We need not address the District's standing argument. Under the facts here, we agree with the trial court's reasoning.

### Dismissing BCBS From the Case

The question of whether BCBS is an indispensable or contingently necessary party under K.S.A. 60-219(a) is rendered moot by our affirmance of summary judgment in favor of the District. Moreover, *NEA-Coffeyville* governs this issue substantively. BCBS acted properly by paying the surplus to the District. See *NEA-Coffeyville*, 268 Kan. at 394.

### Conclusion

We conclude our opinion with a further discussion of *NEA-Coffeyville*, 268 Kan. 384, in which we affirmed the return of a BCBS divisible surplus to the insureds. *NEA-Coffeyville* has significant factual differences. Those factual differences contribute to a contrary result here.

The relevant PA's here contained binding arbitration provisions. In the PA's, the parties contractually agreed that disputes involving the interpretation or application of the PA must be resolved through the grievance and arbitration procedure. None of the PA's in *NEA-Coffeyville* contained mandatory binding arbitration provisions. NEA-T bargained for an available and adequate administrative remedy which it was required to exhaust before litigating in the courts over the interpretation or claimed violation of the PA's.

In *NEA-Coffeyville*, we addressed the issue of whether the contractual grievance procedure was an available and adequate administrative remedy that Plaintiffs were required to exhaust prior to filing suit. We said: "The resolution of this question depends upon the provisions of the negotiated agreements between the members of NEA-C and the District with reference to grievance procedures." 268 Kan. at 387-88. We concluded in *NEA-Coffeyville* that the grievance procedure was not an adequate administrative remedy. We observed that the final step of the grievance procedure was a decision by the board of education, not binding arbitration. 268 Kan. at 390-91.

We said in *NEA-Coffeyville:*

"The agreements contain a grievance procedure, but as indicated above in this opinion, such procedure is inadequate to resolve the dispute. *The parties could have but did not include a provision of binding arbitration of such disputes as may arise involving the interpretation, application, or violation of such agreement.* See K.S.A. 72-5424. Thus, the negotiated agreements between NEA-C and the District simply fail to provide any contractual resolution of the dispute before this court. Instead, we are faced with an omitted term." 268 Kan. at 397. (Emphasis added.)

The lack of an adequate administrative remedy in *NEA-Coffeyville* allowed this court to examine and interpret the PA. Here the parties provided for an adequate contractual grievance procedure. An additional important factual distinction between this case and *NEA-Coffeyville* is the notice of the divisible surplus given to the insureds. The District in *NEA-Coffeyville* did not notify the Board or its teachers that it had received a divisible surplus. The *NEA-Coffeyville* plaintiffs did not learn of the surplus until long after the funds had been deposited in a special education fund and in a health insurance reserve account. Before the District here decided what to do with the surpluses, it made the fact of the divisible surpluses known to its employees. The issue was discussed at length by the insurance committee on which NEA-T representatives were participants. The decisions on distribution were made in public meetings. NEA-T knew or should have known that it had 15 days in which to file a timely grievance regarding the divisible surplus decision.

Affirmed.

ABBOTT, J., not participating.

JAMES W. PADDOCK, Senior Judge, assigned.[1]

LOCKETT, J., dissenting: I respectfully dissent with the majority's finding that the National Education Association-Topeka's (NEA-T) objection to the Unified School District No. 501's (District) failure to distribute the divisible surplus is subject to the grievance procedure of the Professional Agreement (PA).

It is important to note that we have previously determined that a divisible surplus accumulated under a group health insurance policy, containing a divisible surplus rider, purchased by a school board pursuant to a negotiated agreement with teachers is not subject to additional mandatory negotiation under K.S.A. 72-5413. See *U.S.D. No. 259 v. Kansas-National Education Ass'n*, 239 Kan. 76, Syl. ¶ 1, 716 P.2d 571 (1986). Who is entitled to the surplus under a written contract is a question of law for the courts. See *Hollenbeck v. Household Bank*, 250 Kan. 747, 829 P.2d 903 (1992).

The majority quotes *U.S.D. No. 259 v. Kansas-National Education Ass'n*, 239 Kan. 76, Syl. ¶ 2, 716 P.2d 571 (1986), for the statement of law that " '[w]here a contractual provision in a group health insurance plan specifies the method of distribution of a divisible surplus, that provision controls.' " 269 Kan. 544 (2000). The majority then states that the Rider in this case specifies the method of distribution of the divisible surplus but does not govern NEA-T's rights, if any, to it. The majority fails to consider the express language of the Rider. The BCBS group contract defines "Contract Holder" as "USD 501 Single Active Employees." The Rider provides, in part:

"Distribution of Divisible Surplus.
"Divisible Surplus is distributed in this manner:
"1. To meet the Contract Holder's [teachers'] minimum group reserve needs (if any) for the benefits of the Group Contract.

---

[1] **REPORTER'S NOTE:** Judge Paddock was apointed to hear case No. 81,073 vice Justice Abbott pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616.

"2. The remainder, if any, is paid in cash to the Contract Holder [teachers] or upon written request [of the teachers] applied as an adjustment of future premiums.

"Any part of the Divisible Surplus that is paid in cash and is in excess of the Contract Holder's [teachers'] share of the premiums shall be applied for the sole benefit of the Insureds.

"Distribution of any Divisible Surplus in accordance with this provision shall completely discharge the Company from liability with respect to the adjustment of premiums so distributed."

Clearly, the Rider provides for more than the "method of distribution"; the Rider specifically designates the party to whom any surplus will be distributed and who obtains the benefit of the distribution.

BCBS refunded to the District $731,046.47 as divisible surplus. The teachers made no written request that the surplus be applied to adjust the teachers' portion of future premiums. The District distributed half of this amount among plan participants. The remainder was placed in the District's premium stabilization fund to adjust future premiums. NEA-T claims that the health insurance contract purchased by the District provides that the Contract Holder(s) (teachers) are entitled to the surplus and the Rider to the contract states the surplus is to be distributed to the insureds (teachers).

In *U.S.D. No. 259*, 239 Kan. 76, a factually similar case, a dispute arose as a result of a divisible surplus paid by BCBS to the school district as trustee. The teachers' contract with the Board of Education of Unified School District No. 259 (Board) provided that any divisible surplus from the teachers' health insurance plan provided for the teachers as part of their benefit package would be paid to the teachers as extra earnings in regular payroll checks.

The divisible surplus rider that was part of the health insurance contract was substantially similar to the rider in this case, with the exception that the *U.S.D. No. 259* rider provided that where the divisible surplus was paid and was in excess of the contract holder's share of the dues, it was to be applied for the sole benefit of the "subscribers." 259 Kan. at 78. Unlike our case, the contract holder in *U.S.D. No. 259* was the Board, not the insureds.

The teachers' associations, the Kansas-National Education Association (K-NEA) and National Education Association-Wichita (NEA-W), contended that only those individuals enrolled in the BCBS health plan during the plan year in which the divisible surplus accumulated were entitled to share in a prorated distribution of the surplus. The Board contended that the surplus was a "plan asset" available for the benefit of the group on the date of the distribution (the subsequent plan year). The trial court agreed with the Board, holding that teachers constituted a voluntary association entitled to share as a group in the benefit of the divisible surplus. 239 Kan. at 79. K-NEA and NEA-W appealed.

First, we noted that a divisible surplus accumulated under a group health insurance policy containing a Divisible Surplus Rider, purchased by a school board pursuant to a negotiated agreement with teachers, was not subject to additional mandatory negotiation under K.S.A. 72-5413.

The resolution of the issue in *U.S.D. No. 259* turned on the definition of "subscribers," *i.e.*, the teachers employed at the time the surplus accumulated or the teachers enrolled in the plan at the date of distribution of the surplus. We stated that where a contractual provision in a group health insurance plan specifies the method of distribution of a divisible surplus, that provision controls. 239 Kan. at 80. As to the identification of the "subscribers," we noted that the BCBS contract defined subscribers as the individuals who were covered by the health insurance. 239 Kan. at 80. We reasoned that the surplus occurred as the result of lower use of insurance benefits by the subscribers than was anticipated when the premiums were determined; therefore, those who overpaid their insurance premiums created the surplus and should receive the refund. 239 Kan. at 80. We concluded that all the subscribers for the year in which the surplus occurred were entitled to the surplus. 239 Kan. at 81.

The District negotiated with NEA-T to provide a single low-option insurance benefit as part of its cafeteria plan. The District then contracted with BCBS to provide the employee health insurance. The Rider provides that the surplus is to be paid in cash to the Contract Holder (teachers) and that any part of the divisible

surplus that is paid in cash and is in excess of the Contract Holders' (teachers') share of the premiums shall be applied for the sole benefit of the insureds. The terms of the contract purchased are disputed. A contract purchased pursuant to the negotiation with the teachers is not subject to additional mandatory negotiation. Who is entitled to the surplus under the contract purchased is a question of law for the courts.

ALLEGRUCCI, J., joins the foregoing dissent.