No. 86,237

BLAIR CONSTRUCTION, INC., *Appellee/Cross-appellant*, v. JOHN W. MCBETH and FRANCES L. MCBETH, *Appellants/Cross-appellees*, and CAPITOL FEDERAL SAVINGS and SEDGWICK COUNTY BOARD OF COUNTY COMMISSIONERS, *Defendants*.

(44 P.3d 1244)

680

*Wyatt A. Hoch*, of Foulston & Siefkin L.L.P., of Wichita, argued the cause, and *Trevor C. Wohlford*, of the same firm, was with him on the briefs for appellants/cross-appellees John W. McBeth and Frances L. McBeth.

*Timothy J. King*, of Speth & King, of Wichita, argued the cause and was on the brief for appellee/cross-appellant Blair Construction, Inc.

The opinion of the court was delivered by

LOCKETT, J.: Homebuyers John and Frances McBeth appeal the district court's order holding that the builder, Blair Construction, Inc. (BCI), was entitled to an in personam and in rem judgment. Homebuyers challenge the enforceability of a promissory note and a second mortgage entered into after the delivery of the warranty deed to homebuyers and the trial court's award of prejudgment interest to the builder. Builder cross-appeals, alleging the trial court erred in reducing the amount of the homebuyers' liability.

Bill Blair, the president of BCI, and John McBeth have known each other for approximately 25 years. On March 18, 1997, John McBeth and Frances McBeth entered into a building contract with BCI for the construction of their home. The contract contained the following provisions:

"6. [The McBeths] shall pay [BCI] Two hundred eighty-five thousand and no/100 ($285,000.00) for the residence as follows: Upon signing this agreement, One thousand and no/100 ($1,000.00) an earnest money deposit. Before construction on the residence begins, Forty-eight thousand five hundred and no/100 ($48,500.00) as a further earnest money deposit; the balance of the purchase price in cash at closing.

"7. After signing this agreement, [the McBeths] and [BCI] may agree in writing to alterations in the plan of specifications of the residence. These alterations will be done in the form of a 'change order'. . . .

"For these alterations, at closing [the McBeths] shall pay [BCI] an additional amount subsequently agreed upon, or if no amount is otherwise agreed upon, [the McBeths] shall pay [BCI] builder's cost plus Fifteen Percent (15%). . . .

. . . .

"13. The delivery to and acceptance of the deed by [the McBeths] at the time of closing of title hereunder shall be deemed to constitute full compliance by [BCI] with terms of this agreement. *None of the terms of this agreement survive such delivery except those terms which this agreement becomes null and void* [*sic*].

. . . .

"16. This agreement contains the entire agreement between the parties hereto, and no . . . officer of the parities [*sic*] hereto has authority to make, or has made, any statement, representation or agreement, oral or written, in connection herewith that modifies, adds to, or changes the terms of this agreement, that no modification of this agreement shall be binding upon any of the parities [*sic*] hereto unless the same be executed in writing." (Emphasis added.)

An addendum to the building contract, executed that same day, incorporated the specifications and options into the contract and stated that the real estate commission of $14,825 and the builder's commission of $22,240 were included in the contract price. The addendum also contained the following provision:

"4. If price of home exceeds the contract price, there will be no commission paid to the Realtors or Builder for the overages."

Two additional addendums to the contract were also entered into by BCI and the McBeths in late March 1997. These addendums amended the building contract to provide for BCI to obtain the construction loan, for the McBeths to be responsible for the loan fees and accrued interest on the construction loan, and for a reduction of the earnest money deposit. The building contract had originally provided for the McBeths to obtain the financing for the construction.

A change order in the amount of $6,615.00 was completed and signed by John McBeth and Blair in May 1997. During construction, BCI sold a 4-foot swath of the property to an adjacent property owner with John's permission. BCI credited the money received to the McBeths. Before construction was completed, John agreed to purchase a big screen television for $2,300 from Blair. Throughout the construction, BCI sent the McBeths monthly cost comparisons sheets of the McBeths' home and the model home. A final change order in the amount of $10,093.01 was prepared the day before closing, but was not presented to the McBeths or anyone else prior to or at closing.

On October 24, 1997, the McBeths tendered the remainder of the $285,000 on the building contract to BCI, and BCI conveyed a joint tenancy warranty deed to the McBeths. The deed contained no reference to any additional amount owed BCI. Blair testified that BCI closes on approximately 30 to 35 new homes per year and that he knew the purpose of closing was to settle a contract.

On December 2, 1997, Blair went to the McBeths' home to discuss the overages that were incurred during construction. The McBeths executed a promissory note in the amount of $45,171.47 in favor of BCI, with interest accruing at the rate of ten percent per year, and granted BCI a second mortgage on the property for nearly the entire value of the note. We note that the mortgage granted to BCI was $129.11 less than the value of the note. According to Blair, this difference was attributable to mortgage registration tax and filing fees. The first of three payments on the note was due December 1, 1998.

Since the note and mortgage were executed, the only payments attributable to the McBeths on the note were a $200 credit by Blair for an office chair the McBeths gave Blair and a $968.99 overcharge credit for cabinets placed in the home.

BCI filed suit against the McBeths in September 1999 for $44,483, plus interest. BCI also named the Board of County Commissioners of Sedgwick County and Capitol Federal Savings Bank (Capitol) as defendants in the suit against the McBeths because of potential claims they might have against the property. The Board of County Commissioners answered BCI's petition, noting that no taxes were due at the time that would constitute a lien on the real property. Capitol answered the petition and requested that the district court enter an order declaring it the first lienholder on the property. By court order dated January 31, 2000, Capitol was declared the superior lienholder on the property, subject only to unpaid real estate taxes. Neither of these parties are the subject of this appeal.

On March 2, 2000, the matter was tried to the court. At trial, Blair testified that John McBeth stopped by frequently during the building process to discuss changes in the construction of the home. The normal procedure at BCI is to have the client sign a

change order when the client desires to make a change. Only one change order was prepared and signed regarding the McBeths' house. The change order did not include all the changes John had requested. Blair testified that he sent cost comparisons to the McBeths to keep them apprised of the differences in cost between their home and the model home. The agreement between BCI and the McBeths was to build a home similar to the model home. The model home was not referenced in the building contract.

Blair testified that prior to closing he spoke with John regarding Blair's concern as to the hard costs (actual costs to build the house) of the McBeths' house exceeding the hard costs of the model home. Blair testified that when he provided John with a summary of the overages 1 to 2 weeks before closing, John had agreed to pay all the overages. John had informed him that he did not have the money to pay for the overages at the time, but agreed to Blair's offer to loan John the money in return for a second mortgage and a personal note. Blair testified that a promissory note was not executed prior to closing because all bills were not in at that time and he could not determine the total cost. At closing, Blair was aware the overages were approximately $40,000.

According to Blair, the McBeths originally planned to come to the office and sign the promissory note, mortgage, and estimate of closing costs, but later requested Blair come to their house. Blair testified that when he discussed the amount and basis for the overages at their home, the McBeths had no questions. Blair stated it was not until the summer of 1998 that John McBeth alleged he had been overcharged. Blair claims this occurred around the same time that John had looked into refinancing his house to pay off the note and the first mortgage. The refinancing never took place.

BCI admitted there was a $107.53 error in the value of the promissory note. BCI's bookkeeper, after reducing the note by this error, the value of the chair, and the value of the overcharge on the cabinets, claimed the principle due on the note was $44,375.47. The amount of accrued interest as of the date of trial was claimed to be $9,495.13. Thus, BCI claimed the McBeths owed a total amount under the note of $53,870.60, with $12.16 accruing per day.

John McBeth testified and admitted he owed $2,300 for the television he purchased from Blair because it was "personal." John admitted he had signed the promissory note but had no recollection of doing so. Because he trusted Blair, and Blair had implied that the McBeths were responsible for paying for the overages, John thought he owed Blair and should pay him. John testified he determined he had been overcharged shortly after the note and mortgage were executed. John stated that Blair knew, before they entered into the building contract, that the McBeths only had $285,000 to put into the house. John testified he viewed the cost comparison sheets as showing that BCI was staying within the same cost framework as the model home and denied that the cost comparisons had been sent for the McBeths to track the extra expenses being incurred on their home. John testified they (the McBeths) intended that the sale of the 4-foot swath of the property would pay for the changes they had requested. John admitted that every change to his house from that of the model home was made at his request.

John denied agreeing to any modifications to the building contract that were not in writing and denied entering into an agreement with Blair prior to closing to execute a note or second mortgage to BCI. John testified that at the time of closing he was only aware of his additional obligation for the television and unaware of any overages that Blair claimed the McBeths owed BCI. John testified it was not until after closing that Blair informed the McBeths he had invoices to support the amount he was claiming the McBeths owed. John testified that BCI has never provided the McBeths with these invoices or with a comparison of actual amounts spent and the allowance amounts set out in the specifications and options.

On October 25, 2000, the trial court entered a journal entry judgment finding the McBeths were obligated to BCI and that as of July 18, 2000, the total amount was $41,324.10 ($33,005.02 in principle and $8,319.08 in accrued interest), with interest accruing thereafter at a rate of $9.05 per day. The trial court granted BCI an in rem and in personam judgment against the McBeths in that amount.

The basis for the trial court's reduction in the liability of the McBeths to BCI from that of the promissory note is not set out in the record. The district court file indicates a hearing and entry of judgment occured on July 17, 2000, with BCI's counsel ordered to prepare a journal entry reflecting the court's action. The McBeths objected to BCI's proposed journal entry, claiming the trial judge, in his oral ruling, had refused to enter judgment on the note and mortgage, reduced BCI's builders fee by one-half ($11,120), and directed entry of judgment against the McBeths on the balance. The McBeths contend the journal entry should only have reflected a money judgment against the McBeths, the judgment should not have included prejudgment interest, the journal entry should have quieted title in the McBeths from the second mortgage, and the journal entry was mathematically incorrect because it failed to give the McBeths credit for the value of the sale of the 4-foot swath of land.

According to the McBeths' reply brief, the July 17, 2000, judgment was entered during a conference in chambers and off the record. The McBeths contend the trial judge did not articulate a basis for his decision but directed BCI's counsel to prepare a journal entry of judgment. The McBeths contend that following their objection to the proposed journal entry, but prior to signing the journal entry, the trial judge suffered a heart attack that led to his retirement from the bench. BCI's proposed journal entry was then signed, without further explanation, by another Sedgwick County judge. BCI provides no explanation for the inadequate record.

Timely notices of appeal and cross-appeal were filed. This court has jurisdiction over the case by transfer pursuant to K.S.A. 20-3018(c).

## ENFORCEABILITY OF PROMISSORY NOTE AND MORTGAGE

The interpretation and legal effect of written documents are matters of law over which this court has unlimited review. *City of Topeka v. Watertower Place Dev. Group*, 265 Kan. 148, 153, 959 P.2d 894 (1998).

The McBeths contend that under the doctrine of merger the promissory note and mortgage are unenforceable. They assert that all agreements in the building contract merged into the deed and were resolved when BCI deeded the property to the McBeths.

## Doctrine of Merger

It is a general rule of law applicable to all contracts, including deeds, that prior stipulations and agreements are merged into the final and formal contract or deed executed by the parties. When a deed is delivered and accepted as performance of a contract to convey, the contract is presumed to be merged into the deed. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, Syl. ¶ 12, 27 P.3d 1 (2001); *Webb v. Graham*, 212 Kan. 364, 365-66, 510 P.2d 1195 (1973); *Griffith v. Byers Construction Co.*, 212 Kan. 65, 68, 510 P.2d 198 (1973); *Linville v. Nance Development Co.*, 180 Kan. 379, 384, 304 P.2d 453 (1956); *Palmer v. The Land & Power Co.*, 172 Kan. 231, 237, 239 P.2d 960 (1952). The merger blends the rights of a creditor and debtor, resulting in the extinguishment of the creditor's right to collect a prior debt.

Merger is not absolute, however, and whether merger occurs ultimately depends upon the intention of the parties. Intent is a question of fact to be determined from examining the instruments and from the facts and circumstances surrounding their execution. *Webb*, 212 Kan. at 366; *Linville*, 180 Kan. at 384. An example of this occurred in *Linville*, where the facts of the case overcame the presumption of merger when, following entry into a contract of sale that did not provide for the seller to invade the buyer's lot and dig a ditch, the buyer relied upon the promise of the seller to fill in the ditch and accepted the deed. 180 Kan. at 384.

An exception to the presumption of merger that has been recognized in Kansas and is necessarily based upon the intention of the parties is that of collateral agreements. In *Webb*, the real estate contract contained a clause requiring the buyer to pay paving assessments in the future. The deed, however, contained no such provision. The *Webb* court held that although there is a presumption that this covenant in the contract became a part of the deed,

when the covenant is intended as an independent collateral agreement between the parties there is no merger. 212 Kan. at 366-67.

There was evidence in the record supporting the district court's determination that the parties did not intend for the merger doctrine to apply. Blair testified that John McBeth, whom Blair had known for 25 years, promised to pay for the overages and that, after telling Blair he did not have the money to pay for the overages, had agreed to Blair's offer to loan him the money in exchange for a personal note and second mortgage. Blair testified:

"A.: I had a summary, yes, but all the bills weren't in yet, and John agreed—John agreed to pay me all the overages no matter what the house cost exactly. We had set a guideline to go abide by, that they exceeded it. He was going to pay it; as simple as that. That's why I agreed to the second mortgage and personal note. If—or I feel he wouldn't have signed it if he didn't agree to do it.

"Q. [Mr. Hoch, defense counsel]: Why didn't you ask him to sign an addendum to the building contract?

"A.: He didn't have the money, per John, so I loaned him the money.

"Q.: Why didn't you ask him in October to sign a promissory note?

"A.: I did, but we couldn't make it out until the bills came in, but he agreed he was going to pay for all the overages. But until all the bills were in, I couldn't determine how much this all was going to be."

The fact the McBeths later signed the promissory note and a second mortgage provides evidence to support BCI's claim that the McBeths had agreed to pay the overages when they accepted the warranty deed.

The trial judge found the testimony of Blair to be more credible. Appellate courts will not reweigh the evidence or judge the credibility of witnesses. *Griffin v. Dale Willey Pontiac-Cadillac-GMC Truck, Inc.*, 268 Kan. 33, 34, 991 P.2d 406 (1999).

Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the factual findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. "Substantial evidence" is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993).

In all contested matters submitted to a judge without a jury, including motions for summary judgment, the judge shall state the controlling facts required by K.S.A. 2001 Supp. 60-252 and the legal principles controlling the decision. If evidence was admitted over proper objection and the judge did not state in his or her reasons for the decision that such evidence, specified with particularity, was not considered, then it shall be presumed in all subsequent proceedings that the evidence was considered by the judge and entered into his or her decision. Supreme Court Rule 165 (2001 Kan. Ct. R. Annot. 200).

The McBeths objected to the proposed journal entry submitted by BCI, claiming that BCI was only entitled to a money judgment against the McBeths, BCI was not entitled to prejudgment interest, title should be quieted in the McBeths from the second mortgage, and the amount of the judgment was incorrectly calculated. The record does not indicate that the McBeths specifically objected to the *inadequacy* of the findings of fact and conclusions of law in the proposed journal entry. There was also no objection lodged by the McBeths following entry of the final judgment by the trial court, nor do the McBeths directly claim that the findings of fact and conclusions of law were inadequate on appeal.

We have recognized that meaningful appellate review is precluded where a trial court's findings of fact and conclusions of law are inadequate to disclose the controlling facts or basis for the court's findings. However, in the absence of any objection to the inadequacy of the trial court's ruling, the reviewing court will presume the trial court found all facts necessary to support the judgment and an omission in findings will not be considered. *Tucker*, 253 Kan. at 378. We, therefore, presume the trial court found all facts necessary to support the judgment.

The record in this case supports judgment for BCI because the facts overcame the presumption of merger. There was consideration to support the promissory note granted by the McBeths to BCI. Thus, the trial court did not err in finding that BCI was entitled to recover from the McBeths.

## Mortgage

It is well established that there are no special formalities required in order to create a mortgage. *Garnett State Savings Bank*

*v. Tush,* 232 Kan. 447, 453, 657 P.2d 508 (1983); *Rex v. Warner,* 183 Kan. 763, 767, 332 P.2d 572 (1958); *Assembly of God v. Sangster,* 178 Kan. 678, 680, 290 P.2d 1057 (1955); *First Nat'l Bank of Anthony v. Dunning,* 18 Kan. App. 2d 518, 523, 855 P. 2d 493, *rev. denied* 253 Kan. 857 (1993). "All that is necessary is that there be a debt and that the instrument creates a *lien* on real property as security for the payment of the debt." *Sangster,* 178 Kan. at 680.

The doctrine of merger did not operate and the promissory note was enforceable. This renders the McBeths' assertion that the mortgage was unenforceable because there was no valid debt meritless.

## PREJUDGMENT INTEREST

The McBeths contend that because the amount due was not liquidated prior to the trial court's entry of judgment, the trial court erred in awarding BCI prejudgment interest.

Prejudgment interest is governed by K.S.A. 16-201: "Creditors shall be allowed to receive interest at the rate of ten percent per annum . . . for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance."

In Kansas, the general rule is that prejudgment interest is allowable on liquidated claims. *Miller v. Botwin,* 258 Kan. 108, 119, 899 P.2d 1004 (1995). "A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain or when the same become definitely ascertainable by mathematical calculation." *Hamilton v. State Farm Fire & Cas. Co.,* 263 Kan. 875, 883, 953 P.2d 1027 (1998). See *Miller,* 258 Kan. at 119; *Kilner v. State Farm Mut. Auto. Ins. Co.,* 252 Kan. 675, 686-87, 847 P.2d 1292 (1993). However, the fact that a good-faith controversy exists as to whether the party is liable for the money does not preclude a grant of prejudgment interest. *Miller,* 258 Kan. at 119 (citing *Crawford v. Prudential Ins. Co. of America,* 245 Kan. 724, 737, 783 P.2d 900 [1989]).

Allowance of prejudgment interest is a matter of judicial discretion subject to reversal only upon a showing of abuse of discretion. *BIGS v. City of Wichita,* 271 Kan. 455, 480, 23 P.3d 855 (2001);

*Miller*, 258 Kan. at 119. Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court. *State v. Williams*, 268 Kan. 1, 8, 988 P.2d 722 (1999).

BCI asserts the claim was liquidated because the promissory note specifically stated the due date, the amount due, and the method of payment. The McBeths contend the claim was not liquidated, even if the promissory note was held to be enforceable, because, even at trial, BCI was unsure about the amount of its claim.

Prior to closing, BCI had only prepared change orders reflecting $16,708.01 ($6,615 + $10,093.01) in changes. The promissory note executed after closing was in the amount of $45,171.47. BCI's petition claimed that the McBeths were liable for the principal amount of $44,483. At trial, Blair claimed BCI was entitled to $44,934.83 after agreeing that the promissory note was in error in the amount of $107.53. BCI's bookkeeper claimed BCI was entitled to $44,375.47, also recognizing the $107.53 error in the amount of the promissory note. However, an adjustment of $107.53 to the promissory note does not result in either of the amounts Blair or BCI's bookkeeper had testified was owed. Ultimately, the trial court awarded BCI $33,005.02. Thus, from the record it appears the amount BCI was claiming the McBeths owed BCI was not a specific and definite amount, although the difference between the amounts given was not substantial.

This court has reviewed a trial court's decision to grant or deny prejudgment interest on numerous occasions. In *Miller*, 258 Kan. 108, an attorney brought suit to recover attorney fees based upon a written contingency agreement. The trial court had approved the attorney's 50 percent contingency fee for certain services, but disproved of the attorney's 70 percent contingency fee for other services. The trial court adjusted the 70 percent contingency fee and awarded a 50 percent contingency fee for these services as a matter of equity. The trial court then awarded prejudgment interest on both amounts. The *Miller* court affirmed the trial court's award of prejudgment interest, finding that the contingency fees owed were ascertainable based on the terms of the agreements, even though the award by the trial court was for an amount less than that pro-

vided by the agreements. 258 Kan. at 121. See also *Hamilton*, 263 Kan. at 883 (insurance claim was liquidated and prejudgment interest appropriate even though damages left to jury, because no dispute as to amount of damages and no other damages supported by evidence); *Kilner*, 252 Kan. at 687 (prejudgment interest not available where party had stipulated to amount due for purposes of allowing court to determine legal issue); *Marcotte Realty & Auction, Inc. v. Schumacher*, 229 Kan. 252, 268, 624 P.2d 420 (1981) (judgment based on quantum meruit did not support prejudgment interest because claim not liquidated until trial court determined reasonable worth of services).

Thus, under the reasoning in *Miller*, because the promissory note was in writing and evidenced a specific amount of indebtedness, the claim was liquidated and the trial court did not abuse its discretion in awarding prejudgment interest.

## REDUCING THE AMOUNT OF LIABILITY

BCI filed a cross-appeal, alleging that the trial court erred in reducing the amount of the McBeths' indebtedness, which was clearly set forth in the promissory note and guaranteed by the mortgage. BCI contends that where the language of the promissory note and mortgage are clear and can be carried out, there is no room for construction or modification of their terms.

Promissory notes and mortgages are contracts to which the rules of contract construction apply. *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 661, 876 P.2d 1362 (1994). This court's review of the interpretation of a written contract is de novo. *N.E.A.-Topeka v. U.S.D. No. 501*, 269 Kan. 534, 540, 7 P.3d 1174 (2000). Absent a contract being ambiguous, a court must give effect to the intent of the parties as expressed within the four corners of the instrument. *Metropolitan Life*, 255 Kan. at 661. In this case, the promissory note and mortgage are not ambiguous as to price, even though the amount of the mortgage differs slighty from that of the note.

In *Nelson v. Robinson*, 184 Kan. 340, 336 P.2d 415 (1959), the plaintiff sought cancellation of a real estate sales contract. The trial court, however, refused to grant cancellation of the contract and,

instead, granted equitable relief by way of foreclosure with rights of redemption. On appeal, the vendor argued that the trial court did not have the power in law or equity to render such a judgment because it resulted in making a new contract between the parties. The *Nelson* court stated, as follows:

"In taking this position defendants either overlook or ignore numerous decisions of this court holding (1) that it is a well-settled principle of equity jurisprudence that where a court of equity has obtained jurisdiction of a controversy on any ground it will retain such jurisdiction for the purpose of administering complete relief and doing entire justice with respect to the subject matter [citations omitted]; (2) that a trial court, sitting as a court of equity, is not obliged to render the specific decree prayed for, but may render a decree in accord with its own good judgment or discretion as to what justice demands, in view of the facts pleaded and evidence adduced [citations omitted]; and (3) that in a suit in equity where a court has before it all the property involved, all the parties claiming rights thereto and their respective claims, it should complete the determination of their respective rights and make an appropriate decree so as to avoid future litigation, as far as possible [citations omitted]." 184 Kan. at 344-45.

See also *Kline v. Orebaugh*, 214 Kan. 207, 211, 519 P.2d 691 (1974) (in equitable proceeding brought against trustee for violation of fiduciary duties, court of equity not obligated to render specific relief requested but may make such decree as justice demands under facts and circumstances).

This case involves foreclosure of a mortgage, which is an equitable action. *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 623, 602 P.2d 1299 (1979). Thus, under *Nelson*, the trial court in exercising its equitable powers has jurisdiction to administer complete relief and may render judgment in accordance with what justice demands. 184 Kan. at 344-45.

The trial court adjusted the amount the McBeths owed BCI. By representation of both parties, this adjustment was made by reducing BCI's builder's fee by half. The basis for the trial court's decision to adjust the amount of liability is not supported by the evidence or by the court's decision. However, because BCI did not object to the inadequacy of the trial court's findings of fact and conclusions of law, this court will presume the trial court found all the facts necessary to support the judgment. See *Tucker*, 253 Kan. at 378. Thus, the trial court did not err in adjusting the amount of

the McBeth's indebtedness to BCI in exercising its equitable powers.

Affirmed.